IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| REUBEN LACK | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | |
| SHANNON KERSEY, EMILY | ) | 1:12-cv-930-RWS |
| REISER, and MICHELLE WERRE, in | ) | |
| their official and individual | ) | |
| capacities; and FULTON COUNTY | ) | |
| SCHOOL DISTRICT | ) | |
| | ) | |
| Defendants. | ) | |

---

## AMENDED BRIEF IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

COMES NOW Plaintiff Reuben Lack ("Plaintiff" or "Lack") and files this

*Amended Brief in Support of Plaintiff's Motion for Preliminary Injunction*. This brief

has been amended to comply with the Court's order of March 26, 2012 regarding

redaction.

I.     **FACTUAL BACKGROUND**

Lack is a senior at Alpharetta High School ("AHS") in Fulton County,

Georgia. (Exhibit 1, Declaration of Reuben Lack ("Lack Dec.") at ¶ 2). Lack is

highly successful both academically and in extracurricular pursuits. Lack has

maintained a GPA of 3.7, while also serving as Captain of his nationally-competitive debate team; he is a member of the Fulton County Youth Commission; and he has been actively involved in his Local School Advisory Committee ("LSAC"), representing student perspectives before the school board and administration. (Id. at ¶¶ 3-4, 29b).

Lack is also opinionated and ambitious. In April 2011, Lack ran for Student Body President, on a platform to transform student government from being a ceremonial role focused on "school spirit," to a forum for voicing student concerns on issues of school policy. (Id. at ¶ 6). On April 22, 2011, the students of AHS elected Lack to the position of Student Body President. (Id. at ¶ 7).

Under Lack's leadership, the student council achieved a new vibrancy as a forum for student discussion of policy issues, and actually accomplished a great deal. Whereas the previous President held no formal meetings, and only two informal meetings, Lack conducted ten (10) formal meetings, and a number of informal meetings on specific projects. (Id. at ¶ 29a). Lack lobbied for, and achieved, the removal of a "tax" that students paid for napkins and utensils in the school cafeteria. (Id. at ¶ 8). Lack also led initiatives to provide microwaves in the cafeteria and to install bike racks at AHS. (Id.). Lack was involved in planning a talent show, prom-related events, and a "Green Week," to raise

awareness on environmental issues. (Id.).

The faculty advisors for AHS's student council are Defendants Emily Reiser ("Reiser") and Michelle Werre ("Werre"). Until they announced Lack's removal as President on February 8, 2012, Lack maintained a constructive, positive relationship with Reiser and Werre, and had no indications that they were dissatisfied with his performance. (Id. at ¶10). One possible exception was in September 2011, when Lack was unable to attend some homecoming activities due to his participation in a school-sponsored debate tournament at Wake Forest University. (Id. at ¶ 11). When Lack returned from the tournament, Werre confronted him and stated that he "wasn't being a good role model" because he did not participate in some of the decorating for homecoming. (Id.). In that conversation, Lack expressed to Werre that his focus as President would be on bringing student concerns to the administration, as opposed to "school spirit" type events. (Id.). Werre responded by telling Lack that he "was not being a good leader." (Id.).

On December 15, 2011, Lack emailed the student council, stating that he planned to introduce a resolution at the first council meeting of January 2012, to make the "Prom King and Queen" tradition accessible to gay and lesbian couples, and seeking support for a resolution to that effect. (Id. at ¶ 12; Exhibit 2).

3

Two students responded they would support the resolution. (Exhibit 2).

At the January 12, 2012, meeting of the student council, Lack did introduce a resolution to make the "prom royalty" tradition inclusive to gay and lesbian couples. (Lack Dec. at ¶ 13; see also Exhibit 3 (minutes of January 12, 2012 meeting)). Werre was present as the faculty sponsor. (Id.) Lack recalls that an active discussion developed among the student council members, with each student contributing different ideas. (Id.). At one point, the councilmembers began to coalesce around the idea of renaming "Prom King and Queen" to "Prom Court." (Id.) However, as consensus developed, but before a formal vote could be taken, Werre suddenly interrupted the discussion and stated, "I don't think this is important," and instructed the students to move on to another issue. (Id.) Werre stated there would be no further discussion of the issue. (Id.). Therefore, there was no vote, and the issue appeared to be dead. (Id.).

Nevertheless, at the next student council meeting, on January 26, 2012, Lack re-introduced the "Prom Court" resolution. (Id. at ¶ 14). Werre became visibly agitated. (Id.). Fearing Werre would force a vote on the issue without full discussion and a chance to lobby his fellow councilmembers, Lack motioned to table the resolution, in order to preserve it for later discussion. (Id.). Lack then voted against his own motion to table, in order to preserve his right to

reintroduce the resolution later. (Id.).

After this second attempt to move the prom resolution forward, Lack's tenure as Student Body President began to unravel very suddenly, and very rapidly. On January 31, 2012, Lack began to receive unsolicited private messages, on the website Facebook, from a fellow student, D.F. (Id. at ¶ 15; Exhibit 4). D.F. began by asking "what was going on" with President's Council, a leadership conference Lack had been planning, and asking "what ha[d] been accomplished this year" on student council. (Id.). Lack responded, stating that AHS Principal Shannon Kersey ("Kersey") had "shot down" a President's Council proposal. (Id.) D.F. responded, stating that Principal Kersey herself had told D.F. that Lack's failure to "follow up" on a proposal was to blame for the President's Council not coming to fruition. (Id.).

D.F. further offered that he was "disappointed" in a speech Lack delivered to incoming ninth graders, in which Lack had encouraged the incoming students to become involved in extra-curricular activities and had specifically mentioned the debate team. (Id.). D.F. stated he felt Lack was "belittling" other clubs. (Id.). Lack's short speech to the incoming Freshman was, very plainly, positive, inoffensive, and not belittling to anyone. (See full transcript, attached to Lack Dec.). The sections in which Lack promotes debate are as follows:

High school is a social institution. Beyond the classes and the homework, lie people just like you who are a little nervous about joining a large family. This is why I think everyone needs to find their niche. Find that sport, activity or club that you really like. Get into it. Whether it be football, cheerleading, band or even the debate team, find your thing to stick onto. If you can discover your talents, broaden your mind – with people who will help you on your path, you have found the right place. It gives you a small group of people to start out with, and it surely will calm you down. It will give you older students to help with work, and something to look forward to each week.

Find your activity to get involved it. Stay with it. Be passionate about it. This will make your experience here all the better. Teachers can only do so much – but with this you need to take the active role.

For me, my activity was debate. Nothing more gives you the critical thinking skills and fun of meeting new people at new places. It even looks good for colleges.

(Id.).

D.F. continued to exchange messages with Lack through February 1, 2012, expressing dissatisfaction with various aspects of Lack's tenure as Student Body President. (Lack Dec. at ¶ 18) Lack recalls that the messages "seemed to come out of nowhere." (Id.).

The entire exchange with D.F. occurred off-campus, via private messages. (Id. at ¶ 15).

On February 2, 2012, the day after his exchange with D.F. ended, Lack began to receive emails from Werre, insisting that he attend a meeting with her and Reiser to discuss "scheduling issues." (Id. at ¶ 19). Lack became suspicious

of the urgent request for a meeting with both faculty advisors, as Werre and Reiser had always previously discussed scheduling issues on an informal basis, or over email. (Id. at ¶ 19). Also, the sudden request for the formal meeting followed the strange, unsolicited messages from D.F., in which Lack was harshly criticized for his leadership. (Id.).

On February 8, 2012, Lack finally met with Reiser and Werre. (Id. at ¶ 20). They informed Lack that he was removed as Student Body President, effective immediately. (Id.).

In the February 8, 2012 meeting, Werre read from some sort of prepared statement a numbered list of 16 reasons for Lack's removal. (Id. at ¶¶ 21-23). Many of the items referred specifically to Lack's advocacy for issues as Student Body President. Many of the items came directly from the off-campus email exchange with D.F., which Lack believed had been a private exchange.

While Lack was not provided with a copy of the prepared list, he jotted them down as best he could. The "16 reasons" were:

1. Failure to attend student council events.

2. No proper planning of events

3. Tone in emails / belittling

4. Cancelled meetings

5. Undermining emails

6. Not "following through" with President's Council

7. Speech to Freshman referencing the debate team

8. Attack on Principal Kersey

9. Attacked Student Council Members

10. Pushing personal projects

11. Misled council on Green Week

12. Pushing personal projects (again)

13. Promoting policy changes

14. Not being a role model

15. Lack of accomplishments

16. Not sending reminder emails

(Lack Decl. at ¶ 23).

As shall be further set forth herein, each rationale either (a) referred to expression protected by the First Amendment, (b) was demonstrably and knowingly false, or (c) was too vague to even ascertain what it referred to.

In response to this vague, non-specific list of grievances, Lack asked for what specifically he had done to deserve removal; however, neither Werre nor Reiser would provide him with specifics, simply repeating that he was "not a

good leader" and had been "pushing personal projects." (Lack Dec. at ¶¶ 38-39).

Lack has been devastated by these events. He worked hard to achieve his position as Student Body President, and very much wants to continue his work. (Id. at ¶ 40). Lack is especially devastated that he will not be able to address the student body at graduation, which the Student Body President historically has done. (Id. at ¶ 41). These are irreversible injuries that cannot be undone. Lack is willing to work with teachers and administrators to resolve any legitimate issues they have with his leadership. (Id. at ¶ 40).

The timing of Lack's removal, so soon after his re-introduction of the "prom court" resolution, the suddenness of his removal for issues that had never before been addressed with him, and Werre and Reiser's explicit reference to protected acts of expression, including "promoting policy changes" and the speech to incoming Freshmen, all evidence the fact that Lack was removed for the exercise of rights protected by the First Amendment.

II.    LEGAL STANDARD FOR PRELIMINARY INJUNCTION

To be entitled to a preliminary injunction, a plaintiff must demonstrate (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-

moving party; and (4) if issued, the injunction would not be adverse to the public interest. BellSouth Telecommunications, Inc. v. MCI Metro Access Transmission, 425 F.3d 964, 968 (11th Cir. 2005). This Court has broad discretion in evaluating Plaintiff's Motion. See id.

Preliminary injunctions are valuable tools for preventing restraints on free speech. Because restrictions on the right to free speech cannot be fully compensated for, district courts throughout the Eleventh Circuit have granted equitable relief to prevent irreparable First Amendment harm from continuing, as the underlying litigation progresses. See, e.g. University Books and Videos, Inc. v. Metropolitan Dade County, 33 F.Supp.2d 1364, 1373-74 (S.D.Fla. 1999) ("Because chilled speech cannot be compensated by monetary damages, an ongoing violation of the First Amendment constitutes irreparable injury.") Allen v. School Bd. for Santa Rosa County, Fla., 782 F.Supp.2d 1304, 1313-14 (N.D.Fla. 2011) (granting preliminary injunction against school policies that restricted private religious speech); Reineke v. Cobb County School District, 484 F. Supp. 1252, 1262-63 (N.D. Ga. 1980) (granting preliminary injunction against school principal's attempt to censor school newspaper).

III.    **SUMMARY OF ARGUMENT**

The actions taken by Defendants against Lack constitute punishment for

Lack's exercise of his right to express and advocate for his viewpoint, and an attempt to exercise a prior restraint on protected speech, in violation of Lack's First Amendment right to personal expression in the public school setting. Without the intervention of the Court, Lack will continue to be prevented from exercising the constitutionally protected right to personal expression that was guaranteed to him and other American students by the United State Supreme Court's landmark decision in <u>Tinker v. Des Moines Independent School District</u>, 393 U.S. 503 (1969). The Supreme Court has been crystal clear: just like the students in <u>Tinker</u>, Lack is not required to "shed [his] constitutional rights to freedom of speech or expression at the schoolhouse gate." <u>Id.</u> at 506.

Without the intervention of this Court, Lack will suffer the irreparable harm of being prevented from carrying out the elected office of Student Body President through the remainder of his tenure at AHS, which ends in May upon graduation. He will also suffer the irreparable harm of being prevented from advocating for causes important to him upon the platform of Student Body President, upon which he was elected. The issues he seeks to advocate for as Student Body President will wilt on the vine, not due to their merits, but due to the fact that their primary proponent has been silenced. Other students will be deterred from expressing their viewpoints on controversial issues, and speech

will be chilled throughout AHS and public schools in general. This is a result that cannot stand in a nation governed by the First Amendment.

IV. **LACK ESTABLISHES ALL ELEMENTS FOR ENTRY OF A PRELIMINARY INJUNCTION**

A. There is a substantial likelihood that Plaintiff will prevail on the merits of his case

The First Amendment to the Constitution of the United States provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. CONST. amend I. While the Supreme Court has recognized public school officials' authority to "prescribe and control [student] conduct," the protections of the First Amendment extend to students in the public schools. Tinker, 393 U.S. at 506-07. Students may express their views freely, so long as their chosen mode of expression does not cause "material and substantial interference with schoolwork and discipline." Id. at 511. Further, the censorship of a particular opinion is not constitutionally permissible in the public school setting. Id. at 511.

In Tinker, the Court overruled a public school's ban on students wearing black armbands to protest the Vietnam War. The Court held that despite the intense emotional controversy surrounding the war and students' dissent against it—a former student of the high school had been killed in the war—school authorities could not have reasonably anticipated that wearing black armbands

in protest of the war would materially and substantially disrupt the operation of the school or interfere with the rights of others. Id. at 514. While some students were unreceptive to the armbands and some "made hostile remarks" regarding the armbands, the Court noted that there were "no threats or acts of violence on school premises." Id. at 508.  In the end, the Court found that the school officials' ban was an unconstitutional suppression of a particular opinion. "Students in school . . . may not be confined to the expression of those sentiments that are officially approved." Id. at 511.

Federal courts within the Eleventh Circuit have issued injunctions against school officials who have attempted to curtail student expression in the school newspaper. See Reineke v. Cobb County School District, 484 F.Supp. 1252 (N.D. Ga. 1980). School officials have been held personally liable for punishing students for expressing unpopular viewpoints, such as raising a fist instead of reciting the Pledge of Allegience. See Holloman ex rel Holloman v. Harland, 370 F.3d 1252 (11th Cir. 2004). Even where the student's form of expression has placed him in conflict with school administrators, his speech is still protected by the First Amendment so long as it does not cause a "material and substantial disruption" to the school's pedagogical mission. Id. at 1271-72.

Here, Defendants' actions were unequivocally designed to punish and restrain speech and expression protected by the First Amendment. Lack had no real indication that his position was at risk until immediately after re-introducing the "Prom Court" resolution on January 26, 2012. Werre had previously attempted to shut down student discussion on the issue at the January 12, 2012 meeting. (Lack Dec. at ¶ 13). Reiser and Werre made specific reference to Lack's protected expression in the meeting in which they removed him, stating that he had been advocating "policy changes" and had been "pushing personal projects." (Lack Dec. at ¶ 23). Reiser and Werre made additional specific references to protected speech, informing Lack that he was being removed for a speech he gave to the Freshman class, in which he promoted debate, and for statements he made in an off-campus email exchange. (Id. at ¶¶23, 25).

Regarding the "Prom Court" issue, decisions throughout the district courts have affirmed students' First Amendment rights to speak out on the issue of gay rights (or the absence thereof). See Gillman ex rel. Gillman v. School Bd. for Holmes County, Fla., 567 F.Supp.2d 1359, 1379 (N.D.Fla. 2008) (school district liable for damages for punishing student for wearing t-shirts and buttons expressing support for gay rights); Chambers v. Babbitt, 145 F.Supp.2d 1068

(D.Minn.2001) (rejecting school board ban on a t-shirt with the message "Straight Pride," notwithstanding evidence of "gay-bashing" speech and vandalism of a gay student's car); <u>Henkle v. Gregory</u>, 150 F.Supp.2d 1067 (D.Nev.2001) (holding that student stated a claim for violation of First Amendment when he alleged that school officials punished him from openly stating that he was gay); <u>Fricke v. Lynch</u>, 491 F.Supp. 381, (D.R.I.1980) (holding that public school violated gay student's First Amendment right to speech and expression when it banned him from bringing a same-sex date to the prom, notwithstanding fact that school was forced to provide additional security and escorts).

Werre and Reiser's reference to "attacking Ms. Kersey" can only refer to the off-campus email exchange with D.F., in which Lack stated his opinion that Kersey had "shot down" one of his projects. The "lack of accomplishments" line also appears to be lifted verbatim from the exchange with D.F..[1] This sort of speech is afforded even greater protection than on-campus speech. The law is

---

[1] Further evidencing the fact that Reiser and Werre were reading the private student emails between Lack and D.F., and basing their decision thereon, Defendants' attorney sent Plaintiff's counsel a letter that referred to Lack "admittedly taking advantage of his position." (<u>See</u> Exhibit 5). In the exchange with D.F., Lack had "conceded" that he had "taken advantage of [his] position," in that he had used it to promote the debate team, which was "something positive" that "had worked for [him]." (<u>See</u> Exhibit 4 at pp. 5-6). The letter also refers, inartfully at best, to Lack's "championing the cause of homosexual student rights."

well established that purely off-campus speech, on a public forum such as Facebook, is strongly protected by the First Amendment. <u>See</u> <u>Evans v. Bayer</u>, 684 F.Supp.2d 1365, 1370-31 (S.D.Fla. 2010) (compiling cases, and holding that school may not punish student for Facebook page, created and accessed off-campus, expressing dislike for particular teacher). As the Third Circuit recently held, regarding off-campus communications about a high school principal:

> It would be an unseemly and dangerous precedent to allow the state in the guise of school authorities to reach into a child's home and control his/her actions there to the same extent that they can control that child when he/she participates in school sponsored activities. Allowing the District to punish Justin for conduct he engaged in using his grandmother's computer while at his grandmother's house would create just such a precedent and we therefore conclude that the district court correctly ruled that the District's response to Justin's expressive conduct violated the First Amendment guarantee of free expression.

<u>Layshock v. Hermitage School District</u>, 593 F.3d 249, 260 (3rd Cir. 2010).

Regarding the "Freshman orientation" speech, it is entirely unclear what legitimate purpose Defendants might assert for removing Lack based on that speech. The speech is constructive and positive, encouraging incoming Freshmen to work hard and to become involved in school activities. (<u>See</u> Attachment to Lack Dec.). To the extent Lack was punished for expressing his personal view that debate is a desirable activity, even more so than other activities, that is viewpoint discrimination of the most pointless and trivial kind.

16

2. *Lack's expression did not pose a material risk of disruption to the educational environment*

The fact that Lack's advocacy may have placed him in ideological conflict with Reiser and Werre does not justify his removal. As the Supreme Court famously held:

> Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the campus, that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, and our history says that it is this sort of hazardous freedom-this kind of openness-that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

Tinker, 393 U.S. at 508-09.

And in Holloman, the Eleventh Circuit held that a student's right to disobey direct orders to stand for the pledge, and the student's right to argue with his teacher about the propriety of saying the pledge and engaging in classroom-sponsored prayer was protected. 370 F.3d at 1271-72.

Moreover, it is counterintuitive how Lack's advocacy for the "prom court" resolution, his off-campus email with another student, or his positive, uplifting graduation speech was "substantially disruptive" to the educational function of the school. His lobbying for the prom resolution undoubtedly was a valuable exercise in democracy. And his speech to the Freshman class only served to

17

encourage them to work hard in school and become involved in the extracurricular activity of debate.

The cases involving speech that was actually "disruptive" demonstrates a sharp contrast to the instant case. In the "substantial disruption" cases, the courts upheld punishment for expression that was obscene, promoted drug use, or threatened violence. See Bethel School District v. Fraser, 478 U.S. 675 (1986) (involving student who gave sexually explicit speech to student body); Morse v. Frederick, 551 U.S. 393 (2007) (involving student banner that promoted marijuana use); Boim v. Fulton County School District, 494 F.3d 978 (2007) (involving student who disseminated writing in which she fantasized about killing a teacher). Lack was not punished for lewd or destructive speech. He was punished for advancing constructive, legitimate causes, and lobbying for policy changes using his influence as Student Body President. Nothing about Lack's expression disrupted or threatened the pedagogical goals of AHS. To the contrary, under Lack, student government has become a forum for substantive policy issues and critical thinking on controversial topics.

>    3. *Any supposed "legitimate reasons" for Lack's removal are false and pretextual in nature, and Defendants bear the burden to prove that those reasons substantially motivated the decision.*

The additional reasons given to Lack to justify his removal were vague,

non-specific grievances, many of which are demonstrably false.

The statement that Lack had "failed to attend student council events" was so false that no reasonable person in Reiser and Werre's position could have believed it. Lack attended more events as Student Body President than any previous Student Body President or current council member. (Lack Dec. at ¶ 29). Most notably, perhaps, Lack planned and held ten (10) official meetings and numerous unofficial officer meetings in the first half of the year; whereas the previous President held no official meetings and only two unofficial meetings. (Id. at ¶ 29a). In addition, there are examples of at least two other students who were suspended at the recommendation of Reiser and Werre for not attending meetings, but then allowed to return when they protested. (Id. at ¶ 30). There is no reason these individuals would be treated more favorably with regard to "attendance" issues, except for the fact that Lack had expressed and advocated for unpopular views.

The reference to "not planning events and no follow through" is also completely false, as Lack was deeply involved in the planning of many successful student council events, and had never received prior complaints about this issue. (Id. at ¶¶ 31-32).

It is unclear what "attacked student counsel members" refers to, but may

refer to a situation in which two students were suspended at the recommendation of the Reiser and Werre. This suspension was made with Reiser and Werre's recommendation, and at no point did Lack "attack" these individuals, nor anyone else. (Id. at ¶ 33).

With regard to "not being a role model," and "lack of accomplishments," these statements are simply untrue and hurtful. Self evidently, Lack has accomplished a great deal, both academically and as Student Body President, and has served as a positive role model to his peers.

The remainder of the reasons are completely unclear. Resier and Were would not discuss the matter further with Lack after informing him of his removal, and AHS has never provided Lack or his family with any documentation of Lack's alleged wrongdoings. With regard to statements to the effect of "tone in emails" and "being disrespectful," Lack is respectful in all communications with teachers and peers, even if they disagree on an issue. (See Lack Dec. at ¶ 36). The reference to "Green Week" is also unclear. This is an event organized by the Fulton County Youth Commission ("FCYC"), which Lack chairs. The project was approved by the FCYC and has been supported by the Fulton County Commission, and it is unclear what Reiser and Werre meant when they said Lack had "mislead" someone about the project. (Id. at ¶ 36).

Moreover, even if these "legitimate reasons" truly motivated Lack's removal, these reasons are trivial and cannot be separated from the impermissible reasons given Lack. Where there is a question as to whether a given action was motivated by a permissible or impermissible factor, the question becomes whether the impermissible factors played a "substantial" role in the decision, in the absence of which a difference decision would have been reached. See Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 871 n.22 (1982). If Defendants wish to contend that they would have made the same decision regarding Lack even absent the impermissible considerations, they bear the burden to prove this contention, as an affirmative defense. See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 285-68 (1977). They have not, and cannot, do so.

B. Plaintiff is suffering and will continue to suffer irreparable injury unless this Court issues an injunction

As courts have consistently held, a loss of First Amendment rights is always an irreparable injury. Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable harm."); see also University Books and Videos, Inc., 33 F.Supp.2d at 1373-74 ("Because chilled speech cannot be compensated by monetary damages, an ongoing violation of the First Amendment constitutes

irreparable injury.")

Defendants have removed Lack from his position as Student Body President, something he can never regain once he has graduated from high school. Moreover, every day that passes is a day that Lack is deprived of a leadership role that he earned through his own hard work and diligence. Defendants have prohibited Lack from expressing his viewpoints through the most effective channel available to him, and have stymied his efforts to promote the policy issues that are important to him. Moreover, at the graduation ceremony in May, the Student Body President traditionally addresses the student body. Lack will be deprived of his ability to do that, and will never again have the opportunity. Quite plainly, without swift intervention by the Court, Lack will suffer injuries that can never be undone.

Therefore, the second element for a preliminary injunction is here established.

### C. The threatened injury to Plaintiff vastly outweighs whatever damage the preliminary injunction might cause defendants

Conversely, Defendants cannot show that the entry of a preliminary injunction by this Court will damage them in any way. There is no evidence that Lack's protected expression—his advocacy for the "prom court" resolution, his speech to incoming Freshmen promoting the debate team, his off-campus emails

with D.F.—has caused or will cause any disruption to the discipline and daily routine of AHS. To the contrary, Lack's speech has been used to encourage students to participate in positive, constructive activities, and to exercise the democratic process through student government.

Moreover, Lack has testified that he is willing to work with the faculty and administration of AHS to work out any differences they have, so long as it is consistent with his First Amendment rights. (Lack Dec. at ¶ 40).

It must be noted that the mere fact that Lack's protected expression places him in conflict with his teachers does not constitute "harm" to the educational process. See Tinker, 393 U.S. at 508-09; Holloman, 370 F.3d at 1271-72. And Lack's expression is a far cry from the obscene, violent, or drug-promoting speech that courts have held to be "disruptive" for purposes of the First Amendment.

Therefore, the third element for issuance of a preliminary injunction is here established.

### D. The preliminary injunction is not adverse to the public interest

The injunctive relief sought by Plaintiff in this case is not adverse to the public interest. To the contrary, an injunction is critical to *protect* the public interest in encouraging robust, healthy debate on controversial topics, and in

providing students with a proper model for democracy in the United States.

As noted above, Plaintiff's right to express himself through the context of student government will not create a school safety or discipline problem. Defendants' refusal to permit students to express themselves as permitted by the First Amendment of the Constitution is contrary to the fundamental ideals that so many of our finest men and women have fought and died for. Defendants not only have offended Lack; they have offended the Constitution of the United States.

It is clear that the Court's entry of the proposed preliminary injunction will further the unquestionable public interest in the dissemination and exposure to different ideas. As the Supreme Court has noted, "[t]he classroom is peculiarly the 'marketplace of ideas.' The nation's future depends upon leaders trained through exposure to that robust exchange of ideas." Keyishian v. Bd. of Regents, 385 U.S. 589, 603 (1967).

V.    **Conclusion**

By this Motion for Preliminary Injunction, Plaintiff asks only that school officials honor his constitutionally protected right to personal expression and advocacy. Lack has met his burden to show that he will likely prevail upon the merits of this case at trial; that he has endured both an ongoing and potential

irreparable injury; that his irreparable injury vastly outweighs whatever harm Defendants might suffer by the entry of the preliminary injunction, and that the injunction will serve the public interest. For these reasons, Plaintiff entreats this Court to GRANT his Motion for a Preliminary Injunction, requiring Defendants to reinstate him as Student Body President.

Respectfully submitted, this March 26, 2012.

James E. Radford, Jr.
Georgia Bar No. 108007
*Counsel for Plaintiff*

James Radford, LLC
150 E. Ponce de Leon Ave, Suite 260
Decatur, Georgia 30030
(678) 369-3609
james@jamesradford.com