UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION


| | | |
|---|---|---|
| REUBEN LACK | ) | DOCKET NO. 1:12-CV-930-RWS |
| | ) | |
| PLAINTIFF | ) | ATLANTA, GEORGIA |
| | ) | |
| V. | ) | MARCH 29, 2012 |
| | ) | |
| SHANNON KERSEY, ET AL. | ) | |
| | ) | |
| DEFENDANT. | ) | |


TRANSCRIPT OF MOTION FOR TEMPORARY RESTRAINING ORDER
BEFORE THE HONORABLE RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF:                    JAMES E. RADFORD, ESQ.




FOR THE DEFENDANTS:                   TODD E. HATCHER, ESQ.




COURT REPORTER:                       SHARON D. UPCHURCH
                                      2114 U. S. COURTHOUSE
                                      ATLANTA, GEORGIA 30303-3361
                                      (404) 215-1354



PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT
PRODUCED BY COMPUTER.

## INDEX TO EXAMINATION

WITNESS:                                        PAGE


REUBEN LACK:
DIRECT EXAMINATION                               11
CROSS-EXAMINATION                                27
REDIRECT EXAMINATION                             38

1    P R O C E E D I N G S

2    (MARCH 29, 2012; IN OPEN COURT)

3    THE DEPUTY CLERK:  THE COURT CALLS THE CASE OF REUBEN

4    LACK VERSUS SHANNON KERSEY AND OTHERS, CIVIL ACTION NUMBER

5    1:12-CV-930.

6    THE COURT:  ALL RIGHT.  WE ARE HERE FOR A HEARING ON

7    THE MOTION FOR A TEMPORARY RESTRAINING ORDER THAT'S BEEN

8    REQUESTED BY THE PLAINTIFF.  THE PARTIES HAVE SUBMITTED

9    PLEADINGS AND THE COURT HAS REVIEWED THOSE PRIOR TO TODAY'S

10   HEARING.  WE'VE SET ASIDE, I THINK, ONE HOUR PER SIDE FOR ANY

11   PRESENTATIONS YOU WANT TO MAKE BY WAY OF EVIDENCE OR OTHERWISE.

12   I'M HAPPY TO PROCEED HOW YOU WANT TO.  IF YOU WANT TO

13   MAKE A BRIEF OPENING STATEMENT AND THEN PRESENT EVIDENCE, YOU

14   MAY.  IF YOU WANT TO GO ON INTO YOUR TESTIMONY IF YOU HAVE

15   TESTIMONY, I'M HAPPY TO DO THAT.

16   SO MR. RADFORD, FROM THE PLAINTIFF'S PERSPECTIVE, HOW

17   IS IT YOU WISH TO PROCEED?

18   MR. RADFORD:  YES, YOUR HONOR.  I WOULD LIKE TO MAKE

19   A VERY BRIEF OPENING.  I WANT TO PUT THE TESTIMONY OF MY CLIENT

20   ON AND THEN A BRIEF CLOSING, IF THAT'S POSSIBLE.

21   THE COURT:  I'LL LET YOU MAKE AN OPENING.

22   THEN MR. HATCHER, I'LL GIVE YOU THE OPPORTUNITY TO DO

23   LIKEWISE IF YOU WISH.

24   MR. HATCHER:  THANK YOU, YOUR HONOR.

25   THE COURT:  OKAY.  MR. RADFORD, I'LL HEAR FROM YOU.

1      MR. RADFORD:  GOOD MORNING, YOUR HONOR.

2      THE COURT:  GOOD MORNING.

3      MR. RADFORD:  I'D LIKE TO MAKE A VERY BRIEF OPENING

4  SO THAT I CAN RESERVE THE REMAINDER OF MY TIME TO EXAMINE

5  WITNESSES AND MAKE CLOSING ARGUMENTS, IF YOUR HONOR WILL

6  PERMIT.  BUT I DO WANT TO STATE BRIEFLY WHY A TEMPORARY

7  RESTRAINING ORDER IS SO IMPORTANT IN THIS CASE.

8      THIS IS A CASE WHERE REALLY THE ONLY MEANINGFUL

9  RELIEF THAT CAN BE GRANTED TO MY CLIENT IS THROUGH A TEMPORARY

10  RESTRAINING ORDER AND THEN AN EXPEDITED PROCESS ON THE HEARING

11  FOR A PRELIMINARY INJUNCTION.  MY CLIENT WILL GRADUATE HIGH

12  SCHOOL IN LESS THAN TWO MONTHS, ON OR AROUND MAY 19TH.  ONCE

13  THAT DATE PASSES, THE RELIEF THAT WE ARE REQUESTING, HIS RIGHT

14  TO SERVE AS PRESIDENT OF HIS STUDENT BODY, WILL BE IMPOSSIBLE

15  TO ATTAIN.  AND THERE'S REALLY NO -- IT'S CERTAINLY VERY

16  DIFFICULT TO ASCERTAIN THE WAY TO COMPENSATE HIM FOR THAT FROM

17  A MONETARY PERSPECTIVE.

18      BECAUSE THIS IS A FIRST AMENDMENT CASE AND IT

19  INVOLVES THE CHILLING OF SPEECH, EACH DAY THAT PASSES THAT MY

20  CLIENT IS NOT ABLE TO USE HIS POSITION AS STUDENT BODY

21  PRESIDENT TO ADVOCATE FOR HIS VIEWS AND EXPRESS HIS VIEWS,

22  PERSUADE OTHERS TO ADOPT HIS VIEWS IS A DAY THAT THE FIRST

23  AMENDMENT AND THE RIGHTS TO EXPRESSION UNDER THE FIRST

24  AMENDMENT THAT FORM THE FABRIC OF AMERICAN SOCIETY IS NOT ABLE

25  TO COME TO FRUITION.  SO THIS IS A CASE THAT IS UNIQUELY

1  APPROPRIATE FOR A TEMPORARY RESTRAINING ORDER BECAUSE IT'S VERY

2  RARE THAT YOU HAVE THIS SORT OF CIRCUMSTANCE WHERE, YOU KNOW,

3  HIGH SCHOOL IS SORT OF A UNIQUE THING:  YOU GO, AND ONCE IT'S

4  DONE, IT'S DONE; AND IF YOU'RE A GOOD STUDENT AT LEAST, YOU

5  DON'T GET TO GO BACK.

6         THE FINAL POINT I'D LIKE TO MAKE IN OPENING, I WOULD

7  POINT THE COURT TO THE SEMINAL CASE OF *WOOD VS. WRIGHT.*  THAT'S

8  A CASE FROM THE FIFTH CIRCUIT PRIOR TO THE CREATION OF THE

9  ELEVENTH CIRCUIT.  AND I BROUGHT COPIES FOR THE COURT, IF YOU'D

10 LIKE A COPY.

11        THE COURT:  IF YOU WILL HAND IT UP.

12        MR. RADFORD:  THIS IS A FIFTH CIRCUIT PRIOR TO THE

13 CREATION OF THE ELEVENTH CIRCUIT.  IT'S THE SEMINAL CASE FROM

14 THE CIVIL RIGHTS MOVEMENT AND IT INVOLVES STUDENTS WHO WERE

15 EXPELLED FROM SCHOOL FOR PARTICIPATING IN CIVIL RIGHTS MARCHES

16 OFF CAMPUS.  AND THE FIRST AMENDMENT, OF COURSE, WAS IMPLICATED

17 IN THAT AS WELL AS 42 U.S.C. SECTION 1981.  AND IN THAT CASE

18 THE FIFTH CIRCUIT SAID:  TEMPORARY RESTRAINING ORDER,

19 PRELIMINARY INJUNCTION IS ENTIRELY APPROPRIATE AND, INDEED,

20 NECESSARY TO REINSTATE THE STUDENTS WHO HAD BEEN EXPELLED.

21        SO I JUST WANT TO MAKE -- THERE WAS AN ARGUMENT THAT

22 THE DEFENDANTS HAD MADE IN THEIR BRIEF THAT A TEMPORARY

23 RESTRAINING ORDER IS NOT APPROPRIATE BECAUSE WE'RE NOT, QUOTE,

24 UNQUOTE, PRESERVING THE STATUS QUO.  BUT THIS CASE IS ON POINT

25 THAT IT CAN BE USED TO ACHIEVE THE RELIEF OF REINSTATEMENT THAT

1  WE SEEK.  AND ALSO, AS I KNOW YOUR HONOR IS AWARE, A TEMPORARY

2  RESTRAINING ORDER IS OFTEN USED IN THE FAIR LABOR STANDARDS ACT

3  CONTEXT TO REINSTATE EMPLOYEES WHO ARE TERMINATED AS A RESULT

4  OF PROTECTED ACTIVITY UNDER THE F.L.S.A.

5          AND IF YOUR HONOR WOULD PERMIT ME, I'D LIKE TO --

6  WELL, I GUESS THE DEFENDANTS MAKE AN OPENING STATEMENT --

7          THE COURT:  LET ME ASK YOU A QUESTION BEFORE I LET

8  YOU SIT DOWN.  WOULD YOU AGREE THAT, GETTING TO THE BOTTOM LINE

9  HERE, ESSENTIALLY THIS IS A MATTER OF, SETTING ASIDE WHAT

10  RELIEF WOULD BE APPROPRIATE IN TERMS OF THE ENTITLEMENT TO

11  RELIEF, THIS TURNS ON WHETHER THE ACTIONS TAKEN AGAINST YOUR

12  CLIENT IN REMOVING HIM FROM HIS OFFICE WERE CAUSED BY THE

13  POSITIONS HE TOOK ON THE MOTION THAT HE HAD MADE TO THE STUDENT

14  COUNCIL REGARDING THE PROM COURT AND THAT IF -- AND YOU'VE SEEN

15  THE PAPERS THAT HAVE BEEN FILED ON BEHALF OF THE DEFENDANTS, AS

16  HAVE I, WHICH SUGGEST THAT THAT REMOVAL WAS BASED ON A NUMBER

17  OF OTHER FACTORS RATHER THAN THE PROM COURT ISSUE.  WOULD YOU

18  AGREE THAT YOU'VE GOT TO PREVAIL ON THAT ISSUE ESSENTIALLY TO

19  PREVAIL IN YOUR CASE?

20          MR. RADFORD:  YOUR HONOR, WE HAVE TO PREVAIL ON THE

21  ISSUE THAT HE WAS REMOVED FOR EXERCISING RIGHTS UNDER THE FIRST

22  AMENDMENT.  AND IN OUR PLEADINGS AND IN OUR EVIDENCE, WE'VE

23  IDENTIFIED A NUMBER OF FIRST AMENDMENT ACTIVITIES.  THE

24  RESOLUTION OF PROM COURT WAS ONE OF THOSE, BUT THERE ARE

25  SPECIFIC REFERENCES IN THE STATEMENT THAT WAS MADE TO HIM

1  EXPLAINING WHY HE WAS BEING REMOVED TO OFF-CAMPUS COMMUNICATION

2  HE HAD HAD WITH OTHER STUDENTS.  THE CASE LAW IS VERY CLEAR

3  THAT A SCHOOL CANNOT PUNISH A STUDENT FOR OFF-CAMPUS

4  COMMUNICATION CONSISTENT WITH THE FIRST AMENDMENT.

5        AND THERE WERE REFERENCES TO CLEAR VIEWPOINT

6  DISCRIMINATION.  THERE WAS A SPEECH HE GAVE TO THE INCOMING

7  FRESHMEN IN WHICH HE ENCOURAGED STUDENTS TO PARTICIPATE IN

8  DEBATE.

9        THE COURT:  I HOPE WE'RE NOT GOING TO TALK ABOUT THAT

10  ONE.

11        MR. RADFORD:  YES, YOUR HONOR, I UNDERSTAND THAT.

12        THE COURT:  THAT ONE IS SO FAR OUT THERE, I WOULD

13  HOPE THAT'S NOT GOING TO BE ASSERTED.

14        MR. RADFORD:  YES, YOUR HONOR.  IF YOU HAVE NO MORE

15  QUESTIONS, YOUR HONOR, I'LL --

16        THE COURT:  NO, THAT'S IT.  THANK YOU.

17        MR. HATCHER?

18        MR. HATCHER:  GOOD MORNING, YOUR HONOR.  I'LL BE VERY

19  BRIEF.  WE TRIED TO GET AS MANY AFFIDAVITS WE COULD TOGETHER,

20  SO WE'RE NOT PLANNING ON CALLING ANY LIVE WITNESSES UNLESS IT

21  BECOMES NECESSARY FOR REBUTTAL.

22        FIRST OF ALL, WE DO THINK THIS IS A CASE WHERE THE

23  T.R.O. IS ACTUALLY ASKING TO AWARD THE PLAINTIFF ALL THE RELIEF

24  ESSENTIALLY THAT HE'S ASKING FOR IN THIS CASE.  FOR THAT

25  REASON, IT'S NOT PROPER.  IT'S NOT TO MAINTAIN THE STATUS QUO.

1   THE STATUS QUO WAS SET, IS SET NOW AND WAS SET BACK ON

2   FEBRUARY 8TH WHEN HE WAS REMOVED FROM HIS POSITION FOR A NUMBER

3   OF REASONS THAT WE'VE SET FORTH IN OUR FILINGS.

4           LET US BE CLEAR ABOUT ONE THING:  FROM OUR

5   PERSPECTIVE, THIS IS NOT A CASE THAT RAISES FIRST AMENDMENT

6   ISSUES.  THE FIRST AMENDMENT ISSUES, IN OUR OPINION, QUITE

7   FRANKLY, ARE THERE TO CREATE THE ISSUE THAT THERE'S SOMETHING

8   BAD THAT HAPPENED TO MR. LACK AS A RESULT OF HIM EXERCISING

9   SOME RIGHT PROTECTED UNDER THE FIRST AMENDMENT.  THE FACTS AS

10  WE SEE THEM, AND I THINK AS WE'VE HOPEFULLY SHOWN IN OUR

11  FILINGS, SHOW THAT PLAYED ABSOLUTELY NO PART IN HIS REMOVAL

12  FROM BEING THE PRESIDENT OF THE STUDENT COUNCIL.

13          SO I GUESS WHAT WE'RE REALLY, THE THEME FOR US IS

14  MR. LACK WAS NOT REMOVED FROM HIS OFFICE FOR WHAT HE SAID.  HE

15  WAS REMOVED FOR THINGS THAT HE DID NOT DO THAT WE THINK HE

16  SHOULD HAVE OR THAT HE DID IN A MANNER WE THOUGHT WAS

17  DISRESPECTFUL AND DEMEANING TO HIS FELLOW COUNCIL MEMBERS AS

18  WELL AS TO THE ADVISORS.  THAT IS REALLY ALL I HAVE, YOUR

19  HONOR.

20          THE COURT:  LET ME ASK YOU THIS:  I POSE, I GUESS TO

21  SOME EXTENT, TO YOU THE SAME QUESTION I POSED TO PLAINTIFF'S

22  COUNSEL.  WOULD YOU AGREE THAT THE POSITIONS TAKEN ON THE PROM

23  COURT WERE WITHIN THE AMBIT OF THE FIRST AMENDMENT AND WOULD BE

24  ENTITLED TO SOME PROTECTION, AND IF HE WERE REMOVED FROM HIS

25  POSITION BASED ON THAT AS OPPOSED TO THE OTHER REASONS ASSERTED

1   BY THE DEFENDANTS, THAT HE MIGHT BE ENTITLED TO SOME RELIEF?

2   AND, AGAIN, LET'S NOT TALK ABOUT THE RELIEF.  I UNDERSTAND YOUR

3   POSITION ABOUT THE STATUS QUO.  BUT WOULD YOU AGREE THAT THAT

4   WOULD RAISE FIRST AMENDMENT CONCERNS FOR WHICH HE WOULD BE

5   ENTITLED TO RELIEF?

6           MR. HATCHER:  I THINK IF THAT WAS THE SOLE BASIS THAT

7   HE WAS REMOVED FOR, THEN I THINK HE PROBABLY HAS A DECENT

8   ARGUMENT.  OUR POSITION IS THAT THAT'S NOT THE CASE.

9           THE COURT:  IN TERMS OF THE RELIEF, THE ONLY THING

10  THAT TROUBLES ME A BIT, AND I DO APPRECIATE WHAT YOU'RE SAYING

11  ABOUT ESSENTIALLY HE'S GETTING EVERYTHING IF I GRANT THE

12  T.R.O., BUT CONVERSELY, ISN'T IT POSSIBLE THAT HE GETS NO

13  RELIEF IF I DIDN'T AND HE IS ENTITLED TO PREVAIL?

14          AND THE REASON I SAY THAT IS I HAVE KNOWN HIGH SCHOOL

15  SENIORS AND I KNOW WHAT THE SENIOR YEAR OF HIGH SCHOOL IS

16  ABOUT, AND I KNOW THINGS LIKE BEING STUDENT COUNCIL PRESIDENT

17  OR GETTING A CHANCE TO SPEAK AT GRADUATION AND ALL THOSE THINGS

18  AT THAT STAGE IN YOUR LIFE ARE PROBABLY THE MOST IMPORTANT

19  THINGS THAT ARE GOING ON IN THE WORLD, WORLD PEACE ASIDE.  AND

20  SO IN TERMS OF THE HARM AND THE ABILITY TO CORRECT IT, IF HE

21  WERE ENTITLED TO RELIEF AND THE COURT DID NOT GRANT HIM THAT

22  TYPE RELIEF, CAN WE REALISTICALLY AFFORD -- BECAUSE I DON'T

23  THINK THAT'S THE KIND OF THING YOU CAN PUT A DOLLAR VALUE ON.

24  IS IT POSSIBLE TO FASHION A REMEDY THAT WOULD REALLY MAKE THE

25  PLAINTIFF WHOLE IF HE'S ENTITLED TO RELIEF?

1          MR. HATCHER:  I THINK IT'S VERY DIFFICULT TO ANSWER.

2     I SEE THE POINT THAT THEY'RE MAKING.  HE'S GOT TWO MONTHS LEFT

3     IN SCHOOL APPROXIMATELY.

4          THE COURT:  RIGHT.

5          MR. HATCHER:  I DON'T KNOW WHAT YOU WOULD FASHION AS

6     THE RELIEF, IF THAT'S THE BASIS YOU DECIDE THAT HE'S ENTITLED

7     TO IT.  I DON'T KNOW WHAT ELSE WE COULD DO.  I DON'T THINK YOU

8     CAN COMPENSATE HIM IN MONETARY TERMS.

9          BUT I THINK IN EVALUATING THAT, ONE OF THE BIGGEST

10    FACTORS WE HAVE TO LOOK AT IS WHAT IS GOING TO BE THE IMPACT ON

11    THE WORKINGS OF THAT SCHOOL IF HE IS PLACED BACK IN OFFICE.

12         THE COURT:  RIGHT.

13         MR. HATCHER:  AND WE WOULD SUBMIT TO YOU THE

14    DISRUPTION THAT WOULD BE CAUSED BY THAT WOULD SO FAR OUTWEIGH

15    ANY DAMAGE THAT HE'S GOING TO SAY HE HAD.

16         ONE OTHER POINT, YOUR HONOR.  IT'S IMPORTANT TO

17    REMEMBER HE HAS NOT BEEN RESTRICTED FROM MAKING ANY VIEWPOINTS.

18    HIS SPEECH HAS NOT BEEN RESTRICTED.  THE NARROW ISSUE IS WAS I

19    REMOVED FROM MY POSITION BASED ON ME EXPRESSING A PROTECTED

20    RIGHT.  THAT'S WHAT WE'RE TALKING ABOUT.

21         THE COURT:  I AGREE.  THANK YOU.

22         MR. HATCHER:  THANK YOU, YOUR HONOR.  TO THE EXTENT

23    WE'RE GOING TO HAVE LIVE TESTIMONY, I DON'T KNOW HOW THE COURT

24    WANTS TO HANDLE THE SEQUESTRATION OF WITNESSES, YOUR HONOR.

25         THE COURT:  YES.  IF YOU WISH TO INVOKE THE RULE, WE

1   WILL --

2           MR. HATCHER:  I WOULD.

3           THE COURT:  ALL RIGHT.  OKAY.

4           MR. RADFORD, HOW MANY WITNESSES ARE YOU PLANNING TO

5   PRESENT?

6           MR. RADFORD:  JUST ONE, YOUR HONOR.

7           THE COURT:  OKAY.  YOU MAY CALL YOUR WITNESS.

8           MR. RADFORD:  I CALL MR. REUBEN LACK.

9           (THE WITNESS WAS SWORN.)

10          THE DEPUTY CLERK:  IF YOU'LL PULL TO THE MICROPHONE

11  AND STATE YOUR NAME.

12          THE WITNESS:  REUBEN LACK; R-E-U-B-E-N, L-A-C-K.  IF

13  I MAY GET SOME WATER.

14          THE COURT:  YES; RIGHT TO YOUR LEFT.

15                          REUBEN LACK,

16  HAVING BEEN DULY SWORN, WAS EXAMINED AND TESTIFIED AS FOLLOWS:

17                        DIRECT EXAMINATION

18  BY MR. RADFORD:

19  Q.  I'LL CALL YOU MR. LACK THE FIRST TIME, BUT I IMAGINE

20  (INAUDIBLE) TO CALL YOU REUBEN FOR PURPOSES OF TESTIMONY HERE

21  TODAY?

22  A.  SURE.

23          THE COURT:  MR. RADFORD, LET ME GET YOU TO STAY AT

24  THE PODIUM BECAUSE FOR SOUND PURPOSES, THAT IS HELPFUL.

25          MR. RADFORD:  I UNDERSTAND.

1  BY MR. RADFORD:

2  Q.  NOW, REUBEN, TELL US HOW OLD YOU ARE.

3  A.  I AM 18.

4  Q.  AND ARE YOU A HIGH SCHOOL STUDENT RIGHT NOW?

5  A.  YES.

6  Q.  WHERE ARE YOU IN HIGH SCHOOL?

7  A.  ALPHARETTA HIGH SCHOOL.

8  Q.  ALL RIGHT.  AND I GUESS WE CAN PROBABLY STIPULATE FOR THE

9  RECORD AT SOME POINT YOU WERE CLASS PRESIDENT AT ALPHARETTA

10  HIGH SCHOOL; IS THAT RIGHT?

11  A.  YES.

12  Q.  AND WHAT'S THE OFFICIAL TITLE OF THE POSITION THAT YOU

13  HELD?

14  A.  I THINK IT'S EITHER STUDENT COUNCIL PRESIDENT OR STUDENT

15  BODY PRESIDENT.

16  Q.  AND HOW DID YOU BECOME STUDENT BODY PRESIDENT?

17  A.  IN APRIL -- SORRY, ONE SECOND.  I'M A LITTLE SICK.

18  Q.  ARE YOU A LITTLE NERVOUS?

19  A.  A LITTLE BIT.  FIRST TIME IN A FEDERAL COURTHOUSE.

20      IN APRIL WE HAD ABOUT A WEEK OF CAMPAIGN.  THIS WAS APRIL

21  LAST YEAR.  AND IN MY CAMPAIGN SPEECH AND WHEN I WAS

22  CAMPAIGNING AROUND TO OTHER STUDENTS THROUGHOUT THE SCHOOL, MY

23  BASIS FOR MY CAMPAIGN WAS THAT I WOULD PUSH POLICY ISSUES AND

24  USE MY CONNECTIONS ON PLACES LIKE THE FULTON COUNTY YOUTH

25  COMMISSION TO ENABLE THE SCHOOL TO HAVE, YOU KNOW, POSITIVE

1   INITIATIVES AND TO TRY TO CHANGE RULES.  SPECIFICALLY IN THAT

2   SPEECH I SAID THAT I WOULD WORK ON THE UTENSIL TAX ISSUE WHICH

3   WAS A CAFETERIA POLICY THAT ENDED UP BEING CHANGED AFTER I WAS

4   ELECTED.

5   Q.   OKAY.  AND WAS THERE AN ELECTION OF THE STUDENT BODY?

6   A.   YES.  ALL PEOPLE BESIDES THE GRADUATING SENIORS THAT YEAR

7   WERE INVOLVED IN THE ELECTION.

8   Q.   OKAY.  AND WAS THERE ANY, WAS THERE ANY INVOLVEMENT IN THE

9   TEACHERS OR THE ADMINISTRATION AS FAR AS APPOINTING YOU OR WAS

10  IT STRICTLY BASED ON A VOTE OF THE STUDENTS?

11  A.   IT WAS STRICTLY BASED ON THE VOTE OF THE STUDENTS.

12  Q.   NOW, TELL US ABOUT THE FIRST WEEKS AND MONTHS OF THE 2011

13  SCHOOL YEAR, THE FIRST WEEKS AND MONTHS OF YOUR TENURE AS

14  PRESIDENT.  WHAT SORT OF ACTIVITIES WERE YOU INVOLVED IN?

15  A.   WELL, ACTUALLY, AFTER APRIL, AS SOON AS THE ELECTION HAD

16  HAPPENED, I MET WITH THE OTHER MEMBERS OF THE SCHOOL-WIDE

17  ELECTED STUDENT COUNCIL AND WE DECIDED THAT WE WOULD TRY TO

18  MAKE MORE ORGANIZATION FOR THE, FOR THE ENTITY BY HAVING A SET

19  OF BYLAWS.

20       AND I MET WITH MS. WERRE VERY CLOSE THEREAFTER, AND SHE

21  AGREED WITH ME THE IDEA THAT SHE WANTED THE STUDENT COUNCIL TO

22  BE A REALLY BIG LEADERSHIP AND SHE WANTED IT TO REALLY STAND

23  FOR SOMETHING IN THE CONTEXT OF REALLY REPRESENTING THE

24  STUDENTS.  AND I THOUGHT I HAD A GREAT ALLY.

25       SORRY.  NASAL DRIP, I'M SORRY.

1    AND I GOT ALONG VERY WELL WITH THE STUDENT COUNCIL MEMBERS

2   AND WITH THE ADMINISTRATION.  AND, YOU KNOW, THAT'S WHY IT WAS

3   SO SHOCKING IN FEBRUARY BECAUSE WE HAD SUCH A CORDIAL

4   RELATIONSHIP.

5   Q.   OKAY.  YOU MENTIONED BYLAWS.  HAD THE COUNCIL HAD BYLAWS

6   PREVIOUSLY?

7   A.   IT DID NOT.

8   Q.   OKAY.  AND HOW DID THOSE BYLAWS THAT NOW EXIST, HOW DID

9   THOSE COME INTO BEING?

10  A.   I WROTE THE BYLAWS AND THEN THE STUDENT COUNCIL APPROVED

11  THEM.

12  Q.   DID THE STUDENT COUNCIL HOLD REGULAR MEETINGS UNDER YOUR

13  LEADERSHIP?

14  A.   UNDER MY LEADERSHIP, YES.

15  Q.   OKAY.  AND HOW OFTEN DID Y'ALL MEET?

16  A.   WE GENERALLY MET EVERY OTHER WEEK.

17  Q.   AND DO YOU, ARE YOU, DO YOU HAVE ANY PERSONAL KNOWLEDGE OF

18  WHETHER THE PREVIOUS YEAR STUDENT COUNCIL MET REGULARLY?

19  A.   YES.  LAST YEAR I WAS A JUNIOR CLASS VICE PRESIDENT AND

20  THE YEAR BEFORE THAT I WAS A HOMEROOM REPRESENTATIVE.  BOTH

21  YEARS THERE WERE NO FORMAL MEETINGS HELD, MAYBE ONE OR TWO TO

22  ORGANIZE ACTIVITIES; BUT THERE WERE NO REGULAR MEETINGS OR

23  BYLAWS.

24  Q.   OKAY.  AND DID YOU HAVE ANY INVOLVEMENT IN CHANGING THAT

25  TO BE A SYSTEM WHERE YOU MET REGULARLY?

1    A.   YES.

2    Q.   AND HOW?

3    A.   WELL, WE INCORPORATED THAT RULE INTO THE BYLAWS.

4    Q.   NOW, DID YOU PARTICIPATE REGULARLY IN THE ACTIVITIES OF

5    THE STUDENT COUNCIL?

6    A.   YES.

7    Q.   OKAY.  AND TELL US AS MANY SPECIFIC ACTIVITIES AND EVENTS

8    AS YOU CAN RECALL THAT YOU PARTICIPATED IN.

9    A.   I THINK IT'S PROBABLY THE BEST PLACE TO START IS

10   HOMECOMING WHICH WAS THE FIRST MAJOR ACTIVITY THE STUDENT

11   COUNCIL ENGAGED IN.  IN JULY I MET WITH MS. WERRE --

12        I'M SORRY, STUPID NASAL DRIP.  SORRY.  OKAY.

13        THE COURT:  MR. LACK, TAKE JUST A MOMENT.  RELAX.

14   TAKE A DEEP BREATH.  IT'S ALL RIGHT.

15        THE WITNESS:  THANK YOU.

16        MR. RADFORD:  THANK YOU, YOUR HONOR.

17   A.   (CONTINUING)  SO IN JULY I MET WITH MS. WERRE AND THE

18   STUDENT COUNCIL SECRETARY AND MY DAD WAS ALSO IN THE ROOM.  AND

19   AT THAT MEETING WE DISCUSSED THE ALL-IMPORTANT ISSUE OF THE

20   THEME OF HOMECOMING.  WE DISCUSSED THE COORDINATION WITH THE

21   DECORATOR AND THE GENERAL IDEA OF THE COSTS BEHIND IT.  SO WE

22   THEN SETTLED ON THAT IDEA AT THAT MEETING.  AND THAT WAS JUST

23   ME, MS. WERRE, THE STUDENT COUNCIL SECRETARY, AND MY DAD WAS IN

24   THE ROOM JUST THERE BECAUSE HE DROVE ME THAT DAY.

25        AFTER THAT, IN AUGUST I MET WITH MS. REISER AND SOME OTHER

1   SENIOR CLASS GIRLS AND WE DISCUSSED THE SPIRIT DAY, LIKE THE

2   THEME OF EACH SPIRIT DAY FOR THE HOMECOMING WEEK, ALONG WITH

3   THAT IN AUGUST BECAUSE I KNEW THAT I WOULD NOT BE ABLE TO COME

4   ON THE HOMECOMING DANCE DAY, WHICH I DID TELL MS. WERRE

5   BEFOREHAND, AND SHE WAS FINE AS LONG AS I ORGANIZED STUFF

6   BEFORE AND MADE SURE I WAS ABLE TO FULFILL WHAT I NEEDED TO DO.

7       I MADE SURE THAT I WAS AVAILABLE EVERY LUNCH PERIOD TO

8   HELP OUT.  SOMETIMES THEY WOULD ASK ME TO GO TO THE HOMECOMING

9   TICKET TABLE AND SELL TICKETS.  SOMETIMES THEY WOULD NOT ASK ME

10  TO DO ANYTHING, BUT I WAS ALWAYS THERE FOR ME TO -- I WAS

11  ALWAYS THERE TO BE INVOLVED OR HELP IF THEY NEEDED ME TO BE.

12      AND THE LAST THING REGARDING THE HOMECOMING WAS THAT AT

13  THE FIRST STUDENT COUNCIL MEETING WHICH WAS MAYBE A WEEK OR TWO

14  BEFORE HOMECOMING, I MADE SURE THAT ALL MEMBERS OF THE STUDENT

15  COUNCIL HAD THE OPPORTUNITY TO, YOU KNOW, VOLUNTEER FOR SOME

16  ROLE AND MADE SURE THAT THE FOUNDATION OF THE ACTIVITY WAS IN

17  PLACE.

18      WOULD YOU LIKE ME TO TALK ABOUT OTHER ACTIVITIES OR --

19  Q.   WELL, TELL ME, HOW ABOUT -- LET ME ASK YOU THIS:  WERE

20  THERE SOME ACTIVITIES THAT YOU DID NOT OR YOU WERE NOT ABLE TO

21  PARTICIPATE IN?

22  A.   THERE WERE SOME ACTIVITIES I WAS NOT ABLE TO ATTEND THE

23  ACTUAL EVENT.  BUT IN TERMS OF ORGANIZING, I WAS INVOLVED IN

24  ORGANIZATION BEHIND EACH EVENT, EACH EVENT.

25  Q.   AND WITH REGARD TO SOME OF THE HOMECOMING EVENTS, WHY WERE

1   YOU NOT ABLE TO ATTEND?

2   A.   I HAD A SCHOOL EXCUSE TO BE AT THE DEBATE TOURNAMENT THAT

3   FRIDAY.

4   Q.   WHERE WAS THE DEBATE TOURNAMENT?

5   A.   IT WAS AT WAKE FOREST UNIVERSITY.

6   Q.   NOW, OTHER THAN EVENTS, WHAT ABOUT STUDENT COUNCIL

7   MEETINGS?  DID YOU ATTEND THE MEETINGS OF THE STUDENT COUNCIL?

8   A.   YES.  THE ONLY OFFICIAL MEETING OF STUDENT COUNCIL THAT I

9   WAS NOT ABLE TO ATTEND WAS BECAUSE OF A SCHOOL-EXCUSED COLLEGE

10  VISIT AT BRANDEIS.  BESIDES THAT, THE MINUTES SHOW THAT I WAS

11  THERE FOR EVERY MEETING AND I LED EVERY MEETING.

12  Q.   NOW, YOU MENTIONED THAT IN YOUR CAMPAIGN YOU HAD PROPOSED

13  THAT YOU WOULD LEAD THE STUDENT COUNCIL TO POLICY CHANGES.

14  WERE YOU ABLE TO ACCOMPLISH THAT IN ANY REGARD?

15  A.   YES.  AND THAT IS PROBABLY THE COOLEST PART ABOUT MY

16  ABILITY TO BE STUDENT BODY PRESIDENT.  THERE'S AT LEAST TWO

17  INSTANCES WHERE WE WERE ABLE TO CHANGE ACTUAL SCHOOL RULES THIS

18  YEAR.  IN SEPTEMBER I BROUGHT THE UTENSIL TAX ISSUE TO THE NEW

19  L.S.A.C., THE NEW PRINCIPAL.

20  Q.   AND TELL US WHAT THE L.S.A.C. IS FOR THE RECORD.

21  A.   THAT'S THE LOCAL SCHOOL ADVISORY COUNCIL.  IT'S A GROUP OF

22  TEACHERS, PARENTS AND THE ADMINISTRATOR AND TWO STUDENT

23  REPRESENTATIVES WHO ADVISE THE PRINCIPAL ON EVERYTHING FROM

24  SOME MONETARY ISSUES TO THE GROUNDS KEEPING OF THE SCHOOL.  AND

25  SO I BROUGHT THE ISSUE TO THE L.S.A.C. AS A MEMBER OF THE

1    L.S.A.C., AND I WAS GOING TO TRY TO PUSH TO USE THE L.S.A.C.'S

2    LEGAL AUTHORITY TO GET THE BOARD OF EDUCATION TO GIVE US A

3    RESPONSE ON THE UTENSIL TAX ISSUE.  INSTEAD, THOUGH, MS. KERSEY

4    WAS ABLE TO WORK OUT WITH HER CAFETERIA STAFF A WAY THAT WE

5    WOULD BE ABLE TO GET AROUND THIS RULE SO THAT THE UTENSIL TAX

6    WOULD NOT HAVE TO BE PAID ANYMORE.  AND ONCE I TOLD MY FRIENDS

7    ABOUT THAT, THEY WERE ELATED AND SURPRISED THAT I WAS ABLE TO

8    GET A POLICY CHANGED.

9        ANOTHER POLICY CHANGE THAT WE'VE DONE, I WAS ABLE TO LEAD

10   ON WAS THE MEDIA CENTER POLICY CHANGE THAT WAS MORE RECENT,

11   EITHER DECEMBER OR JANUARY.  EXCUSE ME.  THERE WERE SOME

12   RESTRICTIONS AS TO, SORRY, AS TO WHEN PEOPLE COULD GO TO THE

13   MEDIA CENTER DURING LUNCH PERIODS.  I WAS ABLE TO WORK WITH

14   MS. KERSEY AND THE L.S.A.C. COMMITTEE TO AT LEAST LIFT THIS

15   RULE OR MAKE IT, YOU KNOW, NOT AS STRENUOUS AGAINST STUDENTS.

16   Q.   OKAY.  NOW, WHEN YOU HAD THESE ISSUES WITH POLICY CHANGES,

17   HOW DID YOU PRESENT THESE ISSUES TO THE STUDENT COUNCIL?  HOW

18   WOULD THAT TYPICALLY GO?

19   A.   IT WOULD GO IN EITHER TWO WAYS.  EITHER STUDENTS AT THE

20   END OF THE MEETING WOULD BRING UP AN ISSUE THAT THEY WANTED TO

21   TALK ABOUT AND THEN WE WOULD HAVE, KIND OF HAVE GENERAL

22   DISCUSSION ABOUT THAT, AND THEN THAT ISSUE WOULD BE THE MAIN

23   ITEM OF BUSINESS FOR THE NEXT MEETING; OR I WOULD HEAR FROM

24   SOME PEOPLE WHO WOULD COME UP TO ME, LIKE, HEY, REUBEN, YOU'RE

25   THE STUDENT BODY PRESIDENT, HERE'S AN ISSUE I WANT YOU TO BRING

1  UP. AND THEN I WOULD PUT IT ON THE AGENDA AND WE WOULD DISCUSS

2  IT. I MAY GIVE -- I MAY HAVE GIVEN MY SUGGESTIONS FOR HOW TO

3  RESOLVE IT, BUT GENERALLY IT WAS A VERY NICE DISCUSSION WE HAD

4  IN MEETINGS THAT WAS VERY OPEN.

5  Q.  NOW, I WANT TO ASK YOU ABOUT THE FIRST MEETING OF THE

6  STUDENT COUNCIL ON JANUARY -- OR IN JANUARY. DO YOU REMEMBER

7  THE DATE OF THAT MEETING?

8  A.  I THINK IT WAS JANUARY 8, JANUARY 6 OR 8.

9  Q.  OKAY. SO THE FIRST MEETING IN JANUARY, DID YOU PROPOSE

10  ANY INITIATIVES OR POLICIES TO THE STUDENT COUNCIL?

11  A.  YES. I PROPOSED A SERIES OF RESOLUTIONS, GIVING DIFFERENT

12  OPTIONS FOR HOW WE COULD MAKE THE SCHOOL PROM, THE SCHOOL PROM

13  COURT MORE INCLUSIVE TO GAY AND LESBIAN STUDENTS.

14  Q.  OKAY. AND PRIOR TO BRINGING THAT UP, HAD YOU DISCUSSED

15  THAT ISSUE WITH ANY OF YOUR, ANY OTHER MEMBERS OF THE STUDENT

16  COUNCIL, DID ANY POLLS, ANYTHING LIKE THAT?

17  A.  YES. I TOOK A SURVEY ON FACEBOOK, EXCUSE ME, IN

18  MID-DECEMBER, NEAR THE END OF THE SCHOOL YEAR; SAW A DIVIDE OF

19  SORTS. BUT THERE WAS A PLURALITY OF SUPPORT FOR SOME CHANGE TO

20  THE RULES.

21      ADDITIONALLY, I E-MAILED MEMBERS OF THE STUDENT COUNCIL

22  AND I GOT AT LEAST TWO MEMBERS TO SAY THAT THEY WOULD BE

23  WILLING TO SUPPORT ONE OF THE RESOLUTIONS IN SOME FORM.

24  Q.  OKAY. NOW, TELL ME, HOW DID YOU BRING THAT UP AT THE

25  ACTUAL MEETING?

1   A.   AT THE ACTUAL MEETING, I BEGAN MAKING SURE FIRST THAT

2   EVERYONE WAS KIND OF QUIET AND CALMED DOWN.  THEN AFTER THAT, I

3   SAID, THIS IS AN ISSUE THAT I'VE BEEN TALKING TO THE STUDENTS

4   ABOUT THAT I, YOU KNOW, HEARD ON THE NEWS.  I WANT TO TRY TO

5   MAKE SOME WAY, EVEN IF IT'S A SMALL WAY, THAT WE CAN MAKE OUR

6   SCHOOL SEEM MORE OPEN SO THAT EVEN IF NO STUDENT WERE TO RUN

7   FOR THIS WHO WAS GAY OR LESBIAN, THAT THE OPPORTUNITY WOULD

8   STILL BE THERE FOR THEM TO DO SO.  AND I THOUGHT EVERYONE WAS

9   LISTENING AND WAS, YOU KNOW, VERY NICE.

10      AFTER THAT THERE WERE SOME STUDENTS WHO DID NOT UNDERSTAND

11  OR DID NOT LIKE THE PROPOSAL.  THAT IS TRUE.  BUT AT A CERTAIN

12  POINT IN THE MEETING, WE WERE KIND OF GETTING NOWHERE; BUT THEN

13  ONE STUDENT -- SHOULD I SAY THE NAME OR THE INITIALS?

14      THE COURT:  SAY THE INITIALS.

15  A.   (CONTINUING)  THE INITIALS?  A.D. BROUGHT UP THE IDEA OF,

16  HEY, HOW ABOUT WE JUST CALL IT PROM COURT?  AND I SAID, I THINK

17  THAT'S A GREAT COMPROMISE.  YOU KNOW, THAT WILL MAKE IT SO THAT

18  THE ELECTION PROCESS WON'T CHANGE BUT AT THE SAME TIME, THE

19  STIGMA OF THE NAME KING AND QUEEN, GUY AND GIRL WOULD BE

20  REMOVED.

21      I THOUGHT THAT AFTER SHE SUGGESTED THAT, A LOT OF STUDENTS

22  HAD REACTIONS LIKE, OH, THAT'S ACTUALLY NOT A BAD IDEA.  AND

23  THEN AS I THOUGHT WE WERE KIND OF COMING TO CENSUS ON THAT

24  POINT, THAT'S WHEN THE FACULTY ADVISORS STEPPED IN.

25  Q.   AND WHEN YOU SAY THEY STEPPED IN, WELL, FIRST OF ALL, WHO

1    SPECIFICALLY STEPPED IN?

2    A.   MS. WERRE.

3    Q.   ALL RIGHT.  AND TELL ME WHAT YOU MEAN WHEN YOU SAY SHE

4    STEPPED IN.

5    A.   WELL, FROM THE BEGINNING WHEN I BROUGHT THIS ISSUE UP, SHE

6    SEEMED UNCOMFORTABLE ABOUT THE TOPIC.  HER FACE, I GUESS YOU

7    COULD DESCRIBE AS LIKE STONED IN A SENSE.  SHE REALLY -- I'M

8    NOT SURE WHETHER SHE KNEW I WAS BRINGING IT UP, BUT SHE

9    CERTAINLY SEEMED -- IT WAS, SHE JUST FELT -- SHE WAS AGITATED

10   IS THE WORD I WOULD USE THERE.

11        NOW, WHEN SHE INTERVENED, SHE HAD A VERY, IT WAS ALMOST

12   ANGRY IN SOME RESPECTS.  AND SHE SAID SOMETHING LIKE, I DON'T

13   THINK THIS IS AN ISSUE AND WE NEED TO MOVE ON TO OTHER

14   BUSINESS.  AND THEN SHE, IN HER ANGRY, STILL BEING KIND OF

15   ANGRY, SHOWING THESE NEGATIVE FEELINGS, SHE WENT AROUND THE

16   ROOM, YOU KNOW, SAYING, WHAT DO YOU THINK?  SHOULD WE STILL

17   TALK ABOUT THIS?  IS IT STILL AN ISSUE?

18        AND THEN EACH STUDENT GAVE A RESPONSE.  MY BROTHER AND I

19   BOTH SAID, WE THINK IT IS AN ISSUE.  T.D. SAID, I THINK WE

20   SHOULD STILL TALK ABOUT IT.

21        BUT IT WAS VERY, VERY CLEAR FROM HER REACTION THAT SHE

22   WANTED A NO ANSWER, THAT SHE WANTED THIS TO GO AWAY BECAUSE SHE

23   DID NOT LIKE ANY OF THESE PROPOSALS.

24   Q.   OKAY.  AND WAS THERE EVER A FORMAL VOTE ON THE PROPOSAL?

25   A.   THERE WAS NO, THERE WAS NO FORMAL VOTE ON ACCEPTING ANY

1  PROPOSAL.  THE NEXT MEETING I DID MOVE TO TABLE IT ONLY BECAUSE

2  I WANTED TO HAVE MORE TIME FOR A CONSENSUS BUILDING.  AND I

3  TOLD MY BROTHER TO VOTE IN FAVOR OF IT BECAUSE I WANTED THAT

4  MOTION TO PASS.  THE ONLY REASON I VOTED AGAINST IT WAS THAT I

5  WOULD HAVE THE OPPORTUNITY TO IN THE FUTURE BRING IT UP.

6      SO SHE KNEW AFTER THAT JANUARY 26TH MEETING, THE MEETING

7  WHERE I MOVED TO TABLE IT, THAT I WAS GOING TO TRY TO BRING IT

8  UP AGAIN AND TRY TO FIND A CONSENSUS OPTION.

9  Q.  NOW, TELL -- SO WE WERE TALKING ABOUT THE FIRST MEETING IN

10  JANUARY, AND NOW YOU'RE TALKING ABOUT THE SECOND MEETING IN

11  JANUARY; IS THAT RIGHT?

12  A.  UH-HUH (AFFIRMATIVE).

13  Q.  OKAY.  NOW, TELL ME, HOW DID YOU, HOW DID YOU BRING THE

14  ISSUE BACK UP IN THE JANUARY 26TH MEETING?

15  A.  IN THE JANUARY 26TH MEETING, I SAID THAT IT WAS NOT

16  FORMALLY, THE RESOLUTIONS WERE NOT FORMALLY DISPOSED OF.

17  MS. WERRE'S REACTION, SHE WAS A LITTLE BIT CONFUSED AS TO WHY I

18  WAS BRINGING IT UP AGAIN.

19      I THEN SAID, THE MOTION ON THE TABLE WILL ALLOW US TO

20  CONSIDER IT, CONSIDER A CONSENSUS OPTION AT A LATER TIME WHEN

21  WE CAN WORK IT OUT, YOU KNOW, MORE BEHIND THE SCENES.

22      AND THEN AFTER I WENT AROUND AND THE MOTION PASSED, SHE

23  SAID SOMETHING TO THE EFFECT OF, I'M REALLY CONFUSED; WHY DID

24  YOU VOTE AGAINST YOUR OWN MOTION?  AND I EXPLAINED TO HER THAT,

25  YOU KNOW, I DID NOT AGREE WITH THE MOTION.  I WANTED TO MAKE

1    SURE THAT WE COULD BRING IT UP AGAIN IN THE FUTURE.

2    Q.    SOMETIME AFTER THAT DID YOU ENGAGE IN AN E-MAIL EXCHANGE

3    WITH A FELLOW STUDENT?

4    A.    WELL, HE INITIATED THE EXCHANGE.

5    Q.    OKAY.  AND TELL US HIS INITIALS.

6    A.    D.F.

7            MR. RADFORD:  IF I MIGHT, I ONLY HAVE TWO COPIES OF

8    THIS.  YOUR HONOR, MAY I PRESENT THE WITNESS AND LOOK AT MY OWN

9    COPY FOR REFERENCE?

10           THE COURT:  YES.

11   BY MR. RADFORD:

12   Q.    REUBEN, TAKE A LOOK AT THE DOCUMENT I'VE HANDED YOU AND

13   TELL ME IF THIS IS AN ACCURATE DEPICTION OF THE E-MAIL EXCHANGE

14   THAT YOU HAD WITH THE STUDENT.

15   A.    YES, THIS IS THE ACCURATE FACEBOOK CONVERSATION.

16   Q.    OKAY.  AND AT SOME POINT DID YOU DEVELOP SOME REASON TO

17   BELIEVE THAT THIS STUDENT HAD SHARED YOUR PRIVATE CONVERSATION

18   WITH SOMEONE ELSE?

19   A.    WELL, I KNEW HE SHARED IT ON FEBRUARY 8 WHEN THEY -- WHEN

20   IT WAS DIRECTLY QUOTED FROM IT IN THE MEETING WITH THE TWO

21   FACULTY ADVISORS.  AND THEN THE NEXT DAY IN THE MEETING WITH

22   THE PRINCIPAL AND MY PARENTS, SHE ALSO DIRECTLY QUOTED IT AND

23   SAID THAT, I CAN GO ON FACEBOOK AND CHECK THESE THINGS.  IF A

24   STUDENT BRINGS IT INTO MY OFFICE, I'M ALLOWED TO USE IT.

25   Q.    OKAY.  NOW, TELL ME ABOUT THE DAY THAT YOU LEARNED YOU

1    WERE BEING REMOVED AS STUDENT BODY PRESIDENT.  TELL ME WHAT

2    HAPPENED.

3    A.   WELL, WE HAD A FINAL E-MAIL EXCHANGE ABOUT A MEETING.  THE

4    FACULTY ADVISORS WERE TELLING ME THAT THIS MEETING WAS GOING TO

5    BE ABOUT COMMUNICATION ISSUES/MEETING AND ORGANIZATION.  BUT

6    THEN THEY SAID THEY WANTED TO HAVE IT IN MS. REISER'S CLASSROOM

7    WHICH WE NEVER HAD BEFORE.  I WAS VERY CONFUSED ABOUT WHY WE

8    WERE HAVING IT, SUCH A MUNDANE TOPIC IN A PRIVATE MEETING.  AND

9    SO I THINK I EXPRESSED MY FRUSTRATION ABOUT A KIND OF CONFUSION

10   THAT THEY WEREN'T REALLY TELLING ME WHAT THE ISSUE WAS THAT

11   THEY WERE GOING TO TALK ABOUT.  I CAME IN THINKING THAT IT WAS

12   JUST GOING TO BE ABOUT ORGANIZATION.

13       IN THE MEETING ITSELF, MS. REISER BEGAN DISCUSSING THAT

14   ISSUE; AND SHE SAID THAT WE WANT TO MAKE SURE WE WERE, YOU

15   KNOW, SAID, HERE ON ORGANIZATIONAL ISSUES AND, YOU KNOW,

16   MEETING REMINDERS.  AND AFTER SHE THEN SAID THAT, I HAD A SHEET

17   OF PAPER OUT AND I WAS WRITING DOWN AS I THOUGHT IT WAS JUST

18   GOING TO BE ORGANIZATIONAL ISSUES.

19       THEN MS. WERRE TOOK OUT WHAT LOOKED LIKE A PACKET OF PAPER

20   OF SORTS, OPENED THIS BINDER, AND THEN SAID, REUBEN, HERE ARE

21   SOME ISSUES, PLEASE DON'T TAKE IT PERSONALLY.  AND THEN SHE

22   PROCEEDED TO READ 16 ITEMS.  AND THE PREDICATE OF EACH ITEM WAS

23   LIKE, YOU HAVE DONE THIS, YOU HAVE NOT DONE THIS.  IT WAS VERY

24   PERSONAL, AND HER EMOTIONS WHEN SHE WAS READING IT DID SEEM

25   VERY PERSONAL.

1    MY IMMEDIATE REACTION TO HER SAYING THIS WAS VERY

2  SHOCKING, BECAUSE AT THE VERY END SHE SAID, BECAUSE OF THIS,

3  YOU WILL BE REMOVED AS STUDENT BODY PRESIDENT.  AND I WAS VERY

4  THROWN BACK BECAUSE I NEVER HEARD OF THESE ISSUES BEFORE.  IT

5  WAS, THERE WAS NO WARNING.  IT WAS A COMPLETE SURPRISE.  AND I

6  TRIED TO ANSWER A FEW OF THESE POINTS, BUT I STARTED TO CHOKE

7  UP AND I WAS CRYING VERY MUCH.

8    AFTERWARDS, MS. REISER ACTUALLY GOT OUT OF HER CHAIR AND

9  GOT ME A TISSUE DURING THAT EXCHANGE.  BUT THEN AFTER THAT, SHE

10  SAID SOMETHING LIKE, REUBEN, STUDENTS JUST DON'T LIKE YOU;

11  YOU'RE JUST NOT A GOOD LEADER.  AND I FELT IT WAS VERY

12  PERSONAL.

13    AFTER SHE SAID THAT, MS. WERRE -- AFTER SHE SAID THAT, I

14  SAID SOMETHING LIKE, NOW CRYING VERY MUCH, YOU KNOW, IF THERE'S

15  A PERFORMANCE ISSUE, I'LL BE GLAD TO WORK WITH YOU ON IT.  YOU

16  KNOW, THIS IS THE FIRST TIME I'VE HEARD ABOUT IT.  I REALLY

17  DON'T KNOW WHERE THESE THINGS ARE COMING FROM.

18    AND MS. WERRE JUST SAID, IT'S COME TO A HEAD; YOU KNOW,

19  THERE'S NOT GOING TO BE DEBATE ON THIS.  THIS IS FINAL.

20    AND THEN I GOT OUT OF MY CHAIR VERY CONFUSED.  AND I DON'T

21  KNOW HOW TO DESCRIBE IT, BUT I WAS NOT, YOU KNOW, IN THE BEST

22  STATE.  AND I SAID, YOU KNOW, THIS IS VERY, VERY UNFAIR, OR

23  SOMETHING TO THAT EFFECT.  AND THEN I LEFT THE ROOM STILL

24  CRYING.

25  Q.   ALL RIGHT.  NOW, REUBEN, I WANT SO SHOW YOU -- AND I'M

1    SORRY I ONLY HAVE ONE COPY OF THIS.  I JUST GOT IT THIS

2    MORNING.  I WANT TO SHOW YOU AN AFFIDAVIT THAT THE DEFENDANTS

3    HAVE FILED IN THIS CASE.

4         MR. HATCHER:  I'M SORRY, YOUR HONOR, CAN WE IDENTIFY

5    WHICH DECLARATION IT IS?

6         MR. RADFORD:  I'M SORRY, IT'S THE DECLARATION OF

7    MICHELLE WERRE.

8    BY MR. RADFORD:

9    Q.   REUBEN, IF YOU'D TAKE A LOOK AT THE LAST PARAGRAPH IN

10   PARAGRAPH 33, THERE'S A STATEMENT THAT BEFORE LEAVING THE ROOM,

11   YOU STATED, THIS IS NOT OVER YET.  YOU ARE GOING TO HEAR FROM

12   MY F, STOPPING IN MID-SENTENCE.  DID YOU MAKE A STATEMENT LIKE

13   THAT?

14   A.   NO.

15   Q.   REUBEN, ARE YOU INVOLVED IN ANYTHING OTHER THAN STUDENT

16   GOVERNMENT AT YOUR SCHOOL?

17   A.   YES.

18   Q.   WHAT ELSE ARE YOU INVOLVED IN?

19   A.   I'M OUR SCHOOL'S REPRESEN -- ONE OF A FEW REPRESENTATIVES

20   FOR OUR SCHOOL ON THE FULTON COUNTY YOUTH COMMISSION; AND I'M

21   ALSO A MEMBER OF OUR SCHOOL'S DEBATE TEAM.

22   Q.   DO YOU HAVE ANY FREE TIME?

23   A.   I SOMEHOW DO HAVE SOME FREE TIME, YES.

24   Q.   WHAT DO YOU LIKE TO DO IN YOUR FREE TIME?

25   A.   I HAVE THIS NICE, BIG TELESCOPE THAT WE TAKE OUT SOMETIMES

1    AND LOOK AT THE STARS.  YOU KNOW, IT'S HARD TO SEE FROM OUR

2    HOUSE; BUT SOMETIMES WE'LL GO OUT INTO THE, YOU KNOW, NORTH

3    GEORGIA FIELDS AND WE'LL BE ABLE TO SEE THE STARS.  IT'S VERY

4    PRETTY.

5             MR. RADFORD:  I DON'T HAVE ANYTHING FURTHER, YOUR

6    HONOR.

7             THE COURT:  YOU MAY CROSS-EXAMINE.

8             MR. HATCHER:  BRIEFLY, I DO, YOUR HONOR.

9                        CROSS-EXAMINATION

10   BY MR. HATCHER:

11   Q.   MR. LACK, MY NAME IS TODD HATCHER.  I'M ONE OF THE

12   ATTORNEYS FOR THE SCHOOL DISTRICT.

13   A.   NICE TO MEET YOU.

14   Q.   NICE TO MEET YOU, AS WELL.  SORRY UNDER THESE

15   CIRCUMSTANCES.

16        I WANT TO TALK TO YOU A LITTLE BIT ABOUT THIS FEBRUARY 8TH

17   MEETING THAT YOU HAD WITH MS. WERRE AND MS. REISER, THE ONE

18   WHERE THEY TOLD YOU YOU WERE BEING REMOVED AS THE PRESIDENT OF

19   THE STUDENT COUNCIL.  WHAT EXACTLY IS IT THAT THEY QUOTED FROM

20   THIS FACEBOOK CONVERSATION THAT YOU HAD FROM D.M. (SIC) THAT

21   MADE YOU BELIEVE THAT THEY HAD READ THAT INFORMATION?

22   A.    THEY SAID I ATTACKED THE PRINCIPAL.  AND I BELIEVE AFTER I

23   WAS TRYING TO ANSWER THESE POINTS, THE FIRST THING I POINTED

24   OUT WAS THIS.  AND I SAID, I THINK THIS MUST BE A REFERENCE TO

25   A FACEBOOK CONVERSATION.  AND I THINK THAT THEY EXPRESSED THAT

1  THAT WAS PROBABLY WHERE IT CAME FROM.

2  Q.   YOU THINK THEY DID OR THEY DID?

3  A.   WELL, I BELIEVE THAT'S WHAT THEIR FACIAL REACTION SHOWED;

4  SO, YES.

5  Q.   BUT DID THEY SAY THAT, IS WHAT I'M TRYING TO GET DOWN TO?

6  A.   YES.  AND --

7  Q.   SO WOULD IT BE FAIR TO SAY THAT ON FEBRUARY THE 8TH, AT

8  LEAST WHAT YOU UNDERSTOOD IS THAT ONE OF THE REASONS YOU WERE

9  BEING RELEASED WAS THAT CONVERSATION THAT YOU HAD ON FACEBOOK?

10  A.   ON FEBRUARY 8TH?

11  Q.   WHEN THEY MET WITH YOU AND TOLD YOU THAT.

12  A.   YES.

13  Q.   OKAY.  WHO IS JOYCE BODEEP?

14  A.   I'M SORRY?

15  Q.   DO YOU KNOW A LADY NAMED JOYCE BODEEP, NAN BODEEP?

16  A.   YES, I DO.

17  Q.   WHO IS SHE?

18  A.   I'M SORRY?

19  Q.   WHO IS SHE?

20  A.   SHE'S A MEMBER OF THE L.S.A.C.

21  Q.   OKAY.  I WANT TO SHOW YOU AN E-MAIL, I'LL REFERENCE IT FOR

22  OPPOSING COUNSEL.  IT IS EXHIBIT 3 TO MS. BODEEP'S DECLARATION.

23  I WANT TO GET MY OTHER COPY.

24          MR. RADFORD:  I HAVE IT ON MY COMPUTER.

25          MR. HATCHER:  MAY I APPROACH, YOUR HONOR?

1          THE COURT:  YOU MAY.

2     BY MR. HATCHER:

3     Q.   IF YOU CAN FLIP THE E-MAIL, I WANT TO TALK ABOUT THIS ONE

4     (INDICATING).  I'LL GIVE YOU A MOMENT TO READ IT.  JUST LET ME

5     KNOW WHEN YOU'RE DONE.

6     A.   DO I READ THE ENTIRE PAGE, THE WHOLE PAGE?

7     Q.   YES.

8     A.   (REVIEWING DOCUMENT.)  I HAVE READ IT.

9     Q.   IS THAT AN E-MAIL THAT YOU SENT TO MS. BODEEP ON

10    FEBRUARY THE 8TH AT 6:09 P.M.?

11    A.   THIS IS AN E-MAIL SENT TO MS. SCHULTZ, THIS BOTTOM ONE.

12    THAT'S THE L.S.A.C. --

13    Q.   I'M SORRY, I DIRECTED YOU TO THE WRONG EXHIBIT.  EXHIBIT 2

14    IS WHAT I MEANT.  I'M SORRY.  THAT'S THE ONE.  YOU CAN TAKE A

15    MOMENT TO READ THAT.

16    A.   (REVIEWING DOCUMENT.)

17    Q.   HAVE YOU HAD A CHANCE TO READ IT?

18    A.   YES, SIR.

19    Q.   LET ME ASK THE QUESTION A LITTLE BETTER NOW.  IS THAT THE

20    E-MAIL THAT YOU SENT TO MS. BODEEP AT 6:09 P.M. ON FEBRUARY THE

21    8TH?

22    A.   YES.

23    Q.   OKAY.  IN HERE YOU INDICATE TO HER THAT YOU HAD MET -- OR

24    YOU HAD BEEN RELEASED AND, YOU HAD BEEN RELEASED AS THE

25    PRESIDENT BY MS. KERSEY AND SOME OTHER TEACHERS "FOR BREAKING

1  SOME RULE WHICH I HAVE NOT BEEN INFORMED OF.  THEY HAVE SAID

2  I'M NOT A GOOD LEADER AND I DON'T TAKE MY POSITION SERIOUSLY."

3     DID YOU MENTION ANYTHING IN HERE ABOUT THIS FACEBOOK

4  CONVERSATION?

5  A.  I WAS REFERRING TO THEIR BASIS.  THEIR BASIS WAS THAT I

6  HAD BROKEN A RULE.  AND I WOULD THINK THAT SHE WOULD KNOW THAT

7  I'M NOT THE KIND OF PERSON THAT WOULD DO THAT.

8  Q.  DID YOU INDICATE IN HERE THAT YOUR RELEASE FROM BEING

9  PRESIDENT HAD ANYTHING TO DO WITH YOU SPEAKING OUT ON THE PROM

10 COURT ISSUE?

11 A.  IN THIS E-MAIL, AGAIN, IT'S JUST REFERENCING THEIR BASIS.

12 Q.  OKAY.  DID YOU INDICATE THAT YOU HAD BEEN RELEASED FOR

13 WHAT YOU THOUGHT WAS AN EXERCISE OF ANY FREE SPEECH?

14 A.  AGAIN, WE ONLY GOT CONFIRMATION ON THAT THE NEXT DAY WHEN

15 MS. KERSEY SAID THESE THINGS EXPLICITLY.

16 Q.  CAN YOU TELL US WHO CINDY EICK IS?

17 A.  WHO -- I'M SORRY?

18 Q.  I'M SORRY, TRACEY EICK.

19 A.  SHE IS A TEACHER AT ALPHARETTA HIGH SCHOOL.

20 Q.  YOU TESTIFIED ON DIRECT THAT WHEN YOU CAME TO THE MEETING

21 ON FEBRUARY 8TH WITH MS. WERRE AND MS. KERSEY --

22 A.  SORRY, THE FEBRUARY 8TH MEETING WAS WITH THE TWO FACULTY

23 ADVISORS.

24 Q.  CORRECT.  I'M SORRY, NOT MS. KERSEY.  MS. WERRE AND

25 MS. REISER ON FEBRUARY THE 8TH, YOU THOUGHT IT WAS GOING TO BE

1  ABOUT AN ORGANIZATIONAL ISSUE?

2  A.   YES.

3  Q.   DID YOU HAVE ANY IDEA THAT YOU WERE GOING TO BE RELEASED

4  AS PRESIDENT?

5  A.   NO.

6  Q.   DID YOU MEET WITH MS. EICK THE MORNING OF FEBRUARY THE 8TH

7  BEFORE YOU WENT IN TO MEET WITH MS. WERRE AND MS. REISER?

8  A.   I MAY HAVE MET WITH HER THE NEXT DAY.

9  Q.   YOU DID NOT MEET WITH HER THE MORNING OF?

10  A.   I THINK IT WAS THE NEXT DAY BECAUSE THE CONVERSATION I HAD

11  WITH HER WAS BASED ON THE REMOVAL, SO.

12  Q.   YOU DIDN'T HAVE A MEETING WITH HER IN WHICH YOU INDICATED

13  THAT YOU THOUGHT YOU WERE GOING TO BE REMOVED AS PRESIDENT?

14  A.   THAT IS INCORRECT, NO.

15  Q.   OKAY, ALL RIGHT.  WAS THERE AN AGENDA FOR THE

16  JANUARY 26TH, 2012, COUNCIL MEETING?

17  A.   WAS THERE AN AGENDA?

18  Q.   YES, SIR.

19  A.   YES.

20  Q.   WHEN WAS IT PROVIDED TO THE COUNCIL?

21  A.   I HONESTLY DON'T KNOW THE SPECIFIC DATE.

22  Q.   WHEN WAS IT PROVIDED TO MS. WERRE OR MS. REISER?

23  A.   IT WOULD HAVE BEEN SENT IN THE SAME E-MAIL THAT I SENT TO

24  ALL STUDENT COUNCIL MEMBERS.

25  Q.   DO YOU KNOW THAT YOU SENT THAT TO THEM BEFORE THE MEETING?

1    A.   I HONESTLY DON'T RECALL.

2    Q.   IF I TOLD YOU THAT THEY'VE SAID IN THEIR DECLARATION THAT

3    THEY DIDN'T HAVE THE AGENDA FOR THAT MEETING UNTIL THEY GOT

4    THERE, WOULD YOU HAVE ANY REASON TO DISAGREE WITH THEM?

5    A.   I MAY DOUBT IT BECAUSE I USUALLY DO AS A NORMAL BASIS SEND

6    AGENDAS BEFORE EACH MEETING.

7    Q.   OKAY.  YOU MENTIONED ON DIRECT THAT WHEN YOU GOT TO THE

8    JANUARY 26TH MEETING, YOU SAID, IF I WROTE MY NOTES DOWN RIGHT

9    AND CORRECT ME IF I'M WRONG, THAT MS. WERRE KNEW YOU WERE GOING

10   TO BRING THE ISSUE OF THE PROM COURT BACK UP.

11   A.   ON THE SECOND JANUARY MEETING?

12   Q.   JANUARY 26TH MEETING, I THINK.

13   A.   I SAID BECAUSE SHE ASKED ME WHY I VOTED IN FAVOR OF THE

14   MOTION TO TABLE AND I SAID THAT I WANT TO BRING IT UP WHEN I

15   GET MORE CONSENSUS TO COMPROMISE.

16   Q.   OKAY.  SO IT WASN'T -- I JUST WANT TO MAKE SURE I'M CLEAR.

17   IT WASN'T YOUR TESTIMONY THAT WHEN YOU CAME INTO THE

18   JANUARY 26TH MEETING, THAT MS. WERRE KNEW YOU WERE GOING TO

19   BRING THIS PROM COURT ISSUE UP AGAIN.

20   A.   IT WAS ON THE AGENDA, IF THAT'S WHAT YOU'RE ASKING.

21   Q.   IF SHE DIDN'T HAVE -- WOULD SHE HAVE KNOWN YOU WERE GOING

22   TO BRING THAT UP BEFORE SHE RECEIVED THE AGENDA?

23   A.   I HONESTLY DO NOT KNOW.

24   Q.   OKAY.  WHEN YOU SHOWED UP WHEN YOU HAD THE JANUARY 26TH

25   MEETING, DID ANY OF THE STUDENTS EXPRESS BELIEF THAT THEY

1  THOUGHT THEY WERE GOING TO CONTINUE THE DISCUSSION OF THE PROM

2  COURT ISSUE?

3  A.   CAN YOU REPHRASE OR, SORRY.

4  Q.   DID ANYONE THERE MENTION, HEY, I THOUGHT WE WERE GOING TO

5  CONTINUE THE DISCUSSION OF THIS PROM COURT ISSUE FROM THE LAST

6  MEETING?

7  A.   I HONESTLY DON'T RECALL SUCH A STATEMENT WAS MADE.

8  Q.   WAS THAT THE FIRST THING, THE TABLING, WAS THAT THE FIRST

9  THING THAT WAS DONE AT THE MEETING?

10  A.   AFTER THE ROLL CALL AND APPROVAL OF THE MINUTES, I BELIEVE

11  SO.

12  Q.   OKAY.  WHO IS NANCY ELLIOTT?

13  A.   I THINK SHE'S, I THINK SHE'S AN ADMINISTRATIVE ASSISTANT.

14  NO, MS. -- I'M SORRY, MS. ELLIOTT IS THE OTHER STUDENT COUNCIL

15  OFFICIAL.  SHE DOES PROM ORGANIZATION.

16  Q.   CORRECT.  SHE'S ONE OF THE JUNIOR FACULTY CO-MODERATORS;

17  CORRECT?

18  A.   I BELIEVE SO.

19  Q.   DID SHE SPEAK AT THAT MEETING?

20  A.   AT THE JANUARY --

21  Q.   JANUARY 26TH MEETING?

22  A.   I DON'T KNOW IF SHE SPOKE AT THE JANUARY 26TH MEETING, BUT

23  I DO BELIEVE SHE SPOKE AT THE FIRST STUDENT COUNCIL MEETING ON

24  THE PROM ISSUE.

25  Q.   SO IF I ASKED YOU ANYTHING THAT MS. ELLIOTT SAID AT THE

1   JANUARY 26TH MEETING, YOU WOULD NOT RECALL IT?

2   A.   I WOULD GUESS IT WOULD BE ABOUT THE PAGEANT.

3   Q.   DO YOU RECALL HER SPEAKING ANYTHING, SAYING ANYTHING TO

4   THE COUNCIL AFTER THE ISSUE HAD BEEN TABLED, THE PROM COURT

5   ISSUE HAS BEEN TABLED, TO REMIND THE STUDENTS THAT A MALE COULD

6   RUN FOR PROM KING OR QUEEN AND VICE VERSA?

7   A.   SHE MADE THAT COMMENT AT THE FIRST STUDENT COUNCIL MEETING

8   DURING THE DISCUSSION BEFORE THE PROM COURT PROPOSAL COMPROMISE

9   WAS OFFERED.

10  Q.   SO IF SHE SAID SHE MADE THAT AT THE JANUARY 26TH MEETING,

11  SHE'S MISTAKEN?

12  A.   I'M SORRY?

13  Q.   IF SHE SAYS SHE MADE THAT COMMENT AT THE JANUARY 26TH

14  MEETING, SHE'S WRONG?

15  A.   WELL, IT WOULD BE THE FIRST ONE.  SHE PROBABLY HAS GOT THE

16  DATE INCORRECT.

17  Q.   LET'S TALK ABOUT THE JANUARY 12TH MEETING FOR A MINUTE.

18  A.   UH-HUH (AFFIRMATIVE).

19  Q.   AT LEAST ACCORDING TO WHAT I READ FROM THE MINUTES, IT

20  LOOKED LIKE THAT MEETING STARTED AT 7:52 AND ENDED AT ABOUT

21  8:30 A.M.

22  A.   I THINK THAT'S CORRECT.

23  Q.   OKAY.  I WON'T HOLD YOU TO THE EXACT MINUTE, BUT DOES THAT

24  SOUND ROUGHLY CORRECT?

25  A.   IT SOUNDS ROUGHLY CORRECT, YES.

1    Q.   ALL RIGHT.  HOW MUCH TIME DO YOU THINK Y'ALL SPENT

2    DISCUSSING THE PROM COURT ISSUE?

3    A.   I DON'T KNOW SPECIFICALLY HOW LONG, BUT IT WAS A LONG

4    DISCUSSION.

5    Q.   DO YOU THINK IT WAS MORE THAN HALF THE TIME THERE?

6    A.   I DON'T KNOW.

7    Q.   OKAY.  DO YOU RECALL ANY OF THE STUDENTS DISCUSSING WITH

8    YOU THEIR POSITION THAT THE PROM COURT KING AND QUEEN REALLY

9    WASN'T A COUPLES THINGS BECAUSE -- DO YOU RECALL THAT FIRST?

10   A.   YES, YES.

11   Q.   AND DID YOU UNDERSTAND WHEN THEY WERE EXPLAINING THAT TO

12   YOU THAT ANY PERSON COULD RUN FOR THE KING POSITION, ANY PERSON

13   COULD RUN FOR THE QUEEN POSITION?

14   A.   YES.

15   Q.   DO YOU RECALL THAT THEY ALSO BROUGHT UP THE FACT THAT YOUR

16   PROPOSAL HAD THE POTENTIAL OF EXCLUDING, SAY, SINGLE PEOPLE?

17   A.   YES, ALL THESE POINTS WERE RAISED, YES.

18   Q.   DO YOU RECALL THE FACT THAT IT WAS BROUGHT UP THAT

19   POTENTIALLY YOUR PROPOSAL COULD EXCLUDE CERTAIN GENDERS IF A

20   COUPLE WAS EITHER A LESBIAN OR A GAY COUPLE OR A HOMOSEXUAL

21   COUPLE?

22   A.   THESE POINTS WERE ALL RAISED THE FIRST OF THE FOUR

23   DIFFERENT RESOLUTIONS.  THEY WERE ALL OPTIONS.  THAT WAS JUST

24   THE FIRST ONE.  THERE WERE OTHER RESOLUTIONS THAT WOULDN'T HAVE

25   THOSE SAME DEFICIENCIES.

1  Q.   DID Y'ALL HAVE OTHER BUSINESS TO HANDLE AT THAT

2  JANUARY 12TH MEETING?

3  A.   THERE WAS OTHER BUSINESS ON THE AGENDA, YES.

4  Q.   IS IT POSSIBLE THAT MS. WERRE, SAY, I THINK YOU SAID

5  DURING THAT MEETING SHE EXHIBITED WHAT YOU THOUGHT WAS -- I

6  FORGET THE EXACT WORDS, BUT SHE WAS EXPRESSING SOME NEGATIVE

7  EMOTION, I SUPPOSE?

8  A.   UH-HUH (AFFIRMATIVE).

9  Q.   OR EXPRESSION WHEN YOU BROUGHT THIS ISSUE UP.  IS IT

10 POSSIBLE THAT SHE SIMPLY GOT A LITTLE FRUSTRATED THAT Y'ALL HAD

11 SPENT SO MUCH TIME ON THIS ISSUE AND DIDN'T SEEM TO BE MAKING

12 ANY PROGRESS?

13 A.   NO, BECAUSE SHE NEVER HAD EVER, SHE NEVER ENGAGED IN THE

14 CONVERSATIONS SO DIRECTLY EVER BEFORE IN SUCH A FORCEFUL WAY,

15 PUSHING STUDENTS TO OPPOSE IT.  I WAS SHOCKED BY HER REACTION.

16 Q.   OKAY.  DID SHE SAY THAT THAT'S AN ISSUE THAT Y'ALL JUST

17 AREN'T GOING TO TALK ABOUT, IT'S NOT EVER COMING BACK UP?

18 A.   I DON'T KNOW THAT SHE SAID THOSE WORDS, BUT I DO KNOW THAT

19 SHE EXPRESSED TO EVERYONE THAT SHE BELIEVED IT WAS NOT AN ISSUE

20 AND THAT, YOU KNOW, THAT, YES, IT WAS NOT AN ISSUE.

21 Q.   WHAT DID YOU TAKE THAT TO MEAN?

22 A.   I TOOK IT TO MEAN SHE THOUGHT THAT THE CURRENT SYSTEM WAS

23 NOT DISCRIMINATORY.

24 Q.   IS IT POSSIBLE THAT SHE EXPLAINED TO YOU AND THE OTHER

25 MEMBERS OF THE COUNCIL THAT Y'ALL NEEDED TO MOVE ON TO HANDLE

1  OTHER ITEMS ON THE AGENDA?

2  A.   I THINK HER REACTION STILL EXPRESSED THAT IT WASN'T JUST

3  THAT SHE SAID WE WANTED TO MOVE ON, BUT THEN SHE MOVED AROUND

4  TO THE ENTIRETY OF THE ROOM ASKING THEIR OPINION IN A VERY

5  FORCEFUL, ALMOST ANGRY TONE.  SHE WANTED PEOPLE TO SAY NO.  IT

6  WASN'T JUST MOVING ON.

7  Q.   HOW DO YOU HAVE A BASIS TO SAY SHE WANTED SOMEONE TO SAY

8  NO?

9  A.   THAT WAS THE TONE OF HER VOICE AND THE WORDS SHE SAID

10 PRIOR TO ASKING.  IT WASN'T JUST, LET'S MOVE ON TO THE NEXT

11 ISSUE AND THEN WE TALK ABOUT THE NEXT ISSUE.  IT'S, I THINK WE

12 SHOULD MOVE ON, THIS IS NOT AN ISSUE, SAYING THIS IN AN ALMOST

13 ANGRY TONE, GOING AROUND THE ROOM ASKING EVERYONE THEIR

14 OPINION.  I HAD NEVER SEEN IT EVER BEFORE BY HER.

15 Q.   HAVE YOU READ HER DECLARATION, MS. WERRE'S?

16 A.   I HAVE NOT.

17 Q.   OKAY.  ARE YOU AWARE THAT SHE DOESN'T SAY SHE SAID THOSE

18 THINGS?

19 A.   I DON'T KNOW WHAT'S IN HER DECLARATION.

20       MR. HATCHER:  I THINK THAT'S ALL I'VE GOT, YOUR

21 HONOR.

22       THE COURT:  ANY REDIRECT?

23       MR. RADFORD:  YOUR HONOR, I HAVE A PIECE OF EVIDENCE

24 THAT THE DEFENDANTS FILED ALONG WITH THEIR DECLARATION I WANT

25 TO ADMIT.

1          THE COURT:  ALL RIGHT.

2          MR. RADFORD:  I DON'T KNOW HOW TO GET IT IN.

3          THE COURT:  WELL, IF IT'S IN THE RECORD AS HAVING

4     BEEN FILED AS AN EXHIBIT, YOU MAY USE IT.

5          MR. RADFORD:  YES, YOUR HONOR.  I'LL PROVIDE A COPY.

6     AND I WANTED TO MAKE A COMMENT ABOUT IT IF I MIGHT, YOUR HONOR.

7          THE COURT:  ANY OTHER QUESTIONS FOR THE WITNESS?

8          MR. RADFORD:  WELL, YES, ACTUALLY.  THE EXHIBIT, MAY

9     I SHOW HIM THAT EXHIBIT, YOUR HONOR?

10         THE COURT:  YES.

11                    REDIRECT EXAMINATION

12    BY MR. RADFORD:

13    Q.   REUBEN, TAKE A LOOK AT WHAT I'VE HANDED YOU.  THIS IS A

14    DOCUMENT FILED BY THE DEFENDANTS, AND IT'S HEADED "OFFENSES."

15    AND IT HAS, I THINK YOU'VE SAID 16 ITEMS, BUT IT HAS A NUMBERED

16    LIST OF 21 ITEMS.  TAKE A LOOK AT THIS.  DOES THIS REFLECT

17    ACCURATELY THE, I GUESS THE EXPRESSION THAT WAS MADE TO YOU

18    WHEN YOU WERE TOLD YOU WERE BEING REMOVED?

19    A.   THIS IS A VERY STRANGE DOCUMENT.  A LOT OF THINGS HERE

20    LOOK DRAMATICALLY DIFFERENT FROM WHAT THEY TOLD ME IN THE

21    MEETING.  PLUS, THERE'S 21 THINGS.  SO I DON'T -- I NEED TO

22    LOOK AT THIS MORE THOROUGHLY, BUT THIS LOOKS LIKE IT'S AMENDED

23    OR REVISED FROM WHAT THEY TOLD ME ON FEBRUARY 8.

24    Q.   OKAY.  IF YOU'LL TAKE A SPECIFIC LOOK AT NUMBER 11.  IT

25    STATES:  ACCUSED SPECIFIC COUNCIL MEMBERS TO PROTECT SELF FROM

1   DISGRUNTLED STUDENT BODY.  AND THEN IN PARENTHESES IT SAYS,

2   FACEBOOK CONVERSATION.

3   A.   I HONESTLY DON'T KNOW WHAT THAT REFERS TO.

4        MR. RADFORD:  I DON'T HAVE ANYTHING FURTHER FOR THE

5   WITNESS, YOUR HONOR.

6        THE COURT:  YOU MAY STEP DOWN.

7        ANY OTHER EVIDENCE FROM THE PLAINTIFF?

8        MR. RADFORD:  NO, YOUR HONOR.

9        THE COURT:  ANY ADDITIONAL EVIDENCE BESIDES WHAT'S

10  ALREADY BEEN SUBMITTED ON BEHALF OF THE DEFENDANTS?

11       MR. HATCHER:  NO, YOUR HONOR.

12       THE COURT:  ALL RIGHT.  I'LL HEAR ARGUMENT FROM

13  PLAINTIFF.

14       MR. HATCHER:  IF I MAY, YOUR HONOR, DO WE HAVE A TIME

15  CHECK ON SORT OF WHAT WE ARE, HOW MUCH WE HAVE?  THAT WAY

16  NEITHER ONE OF US IS SURPRISED.

17       THE COURT:  QUITE HONESTLY, YOU'RE BOTH IN GREAT

18  SHAPE.  I CAN'T IMAGINE -- I WOULD HAVE FINISHED LISTENING

19  BEFORE YOU FINISHED TALKING IF YOU USED MORE THAN THE TIME THAT

20  YOU'VE GOT LEFT.

21       MR. HATCHER:  THANK YOU, YOUR HONOR.

22       THE COURT:  OKAY.

23       MR. RADFORD:  YOUR HONOR, THIS IS A MOTION FOR A

24  TEMPORARY RESTRAINING ORDER; AND IT'S, IN ESSENCE, AN EQUITABLE

25  REMEDY.  THE EVIDENCE THAT'S BEFORE THE COURT TODAY, ESPECIALLY

1  WHEN VIEWED IN THE CONTEXT OF THE FACT THAT THIS IS A FIRST

2  AMENDMENT CASE AND THE DAMAGE TO MY CLIENT IF HE IS NOT

3  REINSTATED, THE FACT THAT IT IS TRULY IRREPARABLE, THE EQUITY

4  WEIGHS STRONGLY IN FAVOR OF THE TEMPORARY RESTRAINING ORDER.

5  I WANT TO -- I HAVE DISCUSSED EARLIER THE IRREPARABLE

6  NATURE OF THE DAMAGE, AND I THINK THAT'S DIFFICULT TO DISPUTE.

7  I WANT TO SPEAK ALSO TO THE POINT THAT I PREDICT THE DEFENDANTS

8  WILL MAKE WITH REGARD TO WHETHER THERE'S A RISK OF DISRUPTION

9  OR THERE'S A RISK OF HARM TO THE DEFENDANTS IN THIS CASE THAT

10  WOULD OUTWEIGH THE BENEFITS TO THE PLAINTIFF.

11  AND I WANT TO READ FROM THE SUPREME COURT'S DECISION

12  IN THE FAMOUS CASE OF *TINKER VS. DES MOINES INDEPENDENT SCHOOL*

13  *DISTRICT* WHICH FIRST ESTABLISHED THAT FIRST AMENDMENT -- THAT

14  STUDENTS DO NOT LEAVE THEIR FIRST AMENDMENT RIGHTS AT THE

15  SCHOOLHOUSE GATE.  AND WITH REGARD TO THE QUESTION OF

16  DISRUPTION, THE COURT STATED:  ANY WORD SPOKEN IN CLASS, IN THE

17  LUNCHROOM, OR ON THE CAMPUS THAT DEVIATES FROM THE VIEWS OF

18  ANOTHER PERSON MAY START AN ARGUMENT OR CAUSE A DISTURBANCE.

19  BUT OUR CONSTITUTION SAYS THAT WE MUST TAKE THIS RISK, AND OUR

20  HISTORY SAYS THAT IT IS THIS SORT OF HAZARDOUS FREEDOM, THIS

21  KIND OF OPENNESS THAT IS THE BASIS OF OUR NATIONAL STRENGTH AND

22  OF THE INDEPENDENCE AND VIGOR OF AMERICANS WHO GROW UP AND LIVE

23  IN THIS RELATIVELY PERMISSIVE, OFTEN DISPUTATIOUS SOCIETY.

24  NOW, YOUR HONOR, I WOULD CONTEND THAT THE

25  DECLARATIONS THAT THE DEFENDANTS HAVE SUBMITTED IN THIS CASE,

1    EVEN IF THEY WERE ALL TRUE, EVEN LOOKING AT THOSE DECLARATIONS

2    IN A LIGHT FAVORABLE TO THEM, IF ANYTHING, POINT TO A YOUNG MAN

3    WHO WAS OFTEN DISPUTATIOUS, IN THE SUPREME COURT'S WORDS.  HE

4    WAS AN AGGRESSIVE ADVOCATE FOR HIS VIEWS.  HE WAS AGGRESSIVE

5    ABOUT EXPRESSING HIS VIEWS AND ATTEMPTING TO PERSUADE OTHERS.

6         THERE WILL BE NO EVIDENCE IN THIS CASE THAT HE EVER

7    USED COERCION, THAT HE EVER USED FORCE, THAT HE EVER USED FOUL

8    LANGUAGE IN HIS ATTEMPTS TO PERSUADE PEOPLE.  YES, HE WAS AN

9    AGGRESSIVE ADVOCATE, BUT HE WAS AGGRESSIVE IN THE SENSE THAT

10   AMERICANS ARE TAUGHT TO BE AGGRESSIVE WHEN WE ADVOCATE FOR

11   IDEAS THAT WE BELIEVE IN.  OUR GREATEST ROLE MODELS AS LEADERS,

12   PRESIDENTS OF THE UNITED STATES, I THINK OF LYNDON JOHNSON AND

13   F.D.R., RONALD REAGAN, THESE ARE PRESIDENTS WHO WERE AGGRESSIVE

14   IN THEIR ADVOCACY, WHO PROMOTED THEIR IDEAS AND THEIR AGENDAS

15   AS FORCEFULLY AS POSSIBLE WITHIN THE CONFINES OF THE LAW.

16   MR. LACK WAS NOT NEARLY LYNDON JOHNSON IN HIS, IN THE FORCE OF

17   HIS ADVOCACY; BUT HE CERTAINLY DID LOBBY AND ATTEMPT TO

18   PERSUADE.

19        YOUR HONOR, THERE'S SO MUCH EVIDENCE IN THIS CASE

20   THAT POINTS TO THE FACT THAT MR. LACK WAS PUNISHED FOR

21   EXPRESSION THAT IS PROTECTED BY THE FIRST AMENDMENT.  AND I

22   WANT TO GET TO THE PROM COURT ISSUE AND THAT RESOLUTION.  BUT

23   I'D LIKE TO POINT TO THE EXHIBIT THAT WE JUST TENDERED WHICH IS

24   WHAT THE DEFENDANTS HAVE PRESENTED AS THEIR LIST OF REASONS.

25   AND I BELIEVE THE DEFENDANTS WILL TRY TO CREATE SOME DISPUTE

1  ABOUT WHETHER MR. LACK WAS PUNISHED FOR STATEMENTS THAT HE MADE

2  IN OFF-CAMPUS COMMUNICATION BECAUSE THAT IS THE AREA WHERE THE

3  COURTS HAVE SAID MOST CLEARLY A SCHOOL CANNOT PUNISH.

4        AND IF YOU'LL TAKE A LOOK AT NUMBER 11 IN THIS LIST

5  OF REASONS, IT SPECIFICALLY REFERENCES FACEBOOK CONVERSATION.

6  AND IT SAYS:  ACCUSED SPECIFIC COUNCIL MEMBERS TO PROTECT SELF

7  FROM DISGRUNTLED STUDENT BODY.  NOW, I DON'T KNOW EXACTLY WHAT

8  THAT MEANS.  IT SOUNDS A LOT LIKE WHAT MY CLIENT RECALLS IS HE

9  WAS TOLD THAT HE WAS ATTACKING SOMEONE.  BUT THERE'S SPECIFIC

10 REFERENCE TO THE STATEMENTS THAT HE'S MAKING IN AN OFF-CAMPUS

11 CONVERSATION ON THE WEBSITE FACEBOOK.

12        YOUR HONOR, WITHIN THIS LIST THERE ARE ALSO A NUMBER

13 OF ITEMS THAT WERE GIVEN TO HIM WHICH CLEARLY REFER TO FIRST

14 AMENDMENT ACTIVITY ON HIS PART.  NUMBER 12, ONLY INTERESTED IN

15 PERSONAL PROJECTS.  NUMBER 15, CONCERNED WITH POLICY CHANGES.

16 NUMBER 17, NOT LEADING COUNCIL IN A POSITIVE DIRECTION.  18,

17 NOT RESPECTED BY MAJORITY OF COUNCIL MEMBERS.  THESE ALL REFER

18 TO HIM PUSHING FOR HIS PERSONAL VIEWS ON ISSUES, HIS EXPRESSING

19 HIS VIEW ON ISSUES.  AND, SURE, THAT WILL LEAD PEOPLE TO

20 DISAGREE AND POSSIBLY EVEN DISRESPECT.  BUT THE FIRST AMENDMENT

21 IS MEANT TO PROTECT UNPOPULAR AND MINORITY VIEWPOINTS AS MUCH

22 AS IT IS TO PROTECT THE VIEWPOINTS THAT ARE POPULAR AND THAT A

23 MAJORITY OF PEOPLE FAVOR.

24        AND I'LL REFER THE SUPREME COURT'S RECENT CASE ABOUT

25 THE WESTBORO BAPTIST CHURCH.  THE FACT THAT SPEECH IS, THAT

1    OTHER -- THAT SOME PEOPLE FIND THE MANNER OF SPEECH OFFENSIVE

2    DOES NOT MEAN THAT IT IS TAKEN OUT OF THE REALM OF THE FIRST

3    AMENDMENT.

4              YOUR HONOR, IF YOU LOOK TO THE TIMING OF THE EVENTS

5    IN THIS CASE, I DON'T THINK THERE'S ANY DISPUTE THAT MR. LACK

6    WAS REMOVED VERY SOON AFTER THIS, HIS REINTRODUCTION OF THE

7    PROM COURT RESOLUTION.  MR. LACK HAD BEEN STUDENT BODY

8    PRESIDENT FOR TEN MONTHS.  THERE'S NO RECORD OF PREVIOUS

9    DISCIPLINE.  THERE WAS NO -- HE WAS NEVER WARNED THAT HIS

10   POSITION WAS AT RISK.  AND THEN WITHIN A LITTLE OVER A WEEK

11   AFTER HE INTRODUCES THIS RESOLUTION, THAT HE DESCRIBES THE

12   STUDENT -- OR THE FACULTY ADVISOR TREATING WITH ANGER AND

13   AGITATION AND ATTEMPTING TO SHUT DOWN THE DEBATE ON THE ISSUE,

14   HE IS REMOVED AS STUDENT BODY PRESIDENT.  AND SPECIFIC

15   REFERENCE IS MADE TO HIM PUSHING POLICY CHANGES.

16             IT'S VERY DIFFICULT TO ESCAPE THE CAUSAL RELATIONSHIP

17   BETWEEN HIS ADVOCACY FOR THAT SPECIFIC PROPOSAL AND HIS

18   REMOVAL.  AND THERE'S CERTAINLY A LIKELIHOOD THAT WE WILL

19   PREVAIL ON THAT ISSUE GIVEN THE CLOSENESS IN TIME AND THE

20   SPECIFIC REFERENCES MADE TO HIS ADVOCATING FOR POLICY CHANGES

21   AND PUSHING FOR PERSONAL PROJECTS.

22             YOUR HONOR, I WANT TO -- I THINK THAT THE DEFENDANTS

23   WILL ALSO ARGUE THAT IF MR. LACK IS TO BE -- WAS REINSTATED,

24   THAT IT WOULD CAUSE SOME TERRIBLE HARM TO THE SCHOOL BECAUSE

25   THERE HAS BEEN MEDIA ATTENTION ON THIS CASE.  BUT I BELIEVE

1    THAT THE MOST HARM THAT HAS HAPPENED IS THAT STUDENTS ARE

2    TALKING ABOUT THIS, STUDENTS ARE DEBATING ABOUT THIS.  THERE

3    ARE PEOPLE WHO ARE UPSET ABOUT THIS.

4            BUT I WOULD REMIND THE COURT OF THE CONTEXT IN THE

5    CASE OF *TINKER* WHERE THE COURT SPECIFICALLY REFERRED TO THE

6    FACT THAT THERE WAS HEAVY EMOTION ABOUT THE VIETNAM WAR AND

7    THERE WERE INDIVIDUALS AT THE SCHOOL WHOSE BROTHERS OR WHOSE

8    FAMILY MEMBERS HAD DIED IN THE VIETNAM WAR AND WERE EXTREMELY

9    UPSET AND THERE BEING BOISTEROUS ARGUMENTS ABOUT THE VIETNAM

10   WAR CAUSED BY THESE PROTEST BRACELETS THAT WERE AT STAKE IN

11   THAT CASE.  THE FACT THAT STUDENTS DEBATE THINGS AND ARGUE AND

12   ARE EMOTIONAL ABOUT THINGS, THAT IS NOT HARMFUL.  THAT IS THE

13   OPPOSITE.  THAT IS THE FIRST AMENDMENT TO THE CONSTITUTION AT

14   PLAY.

15           AND I WOULD INVITE THE COURT TO PLEASE LOOK AT THE

16   CASES WHERE THE COURT HAS SAID IT'S OKAY TO PUNISH A STUDENT

17   FOR SPEECH.  THOSE CASES HAVE INVOLVED STUDENTS WHO GAVE

18   SPEECHES THAT WERE OBSCENE, WHERE A STUDENT HAS DISSEMINATED

19   MATERIAL THAT ADVOCATED VIOLENCE.  THERE WAS A CASE ABOUT THE

20   CONFEDERATE FLAG, STUDENTS WEARING THE CONFEDERATE FLAG.

21   HOWEVER, THERE WAS SPECIFIC EVIDENCE IN THAT CASE THAT THERE

22   WERE PHYSICAL FIGHTS AND VIOLENCE BREAKING OUT AS A RESULT OF

23   THE WEARING OF THE CONFEDERATE FLAG.

24           THERE'S A CASE THAT THE DEFENDANTS HAVE CITED ABOUT A

25   STUDENT WHO HELD UP A BANNER AT A FOOTBALL GAME ADVOCATING

1    ILLEGAL DRUG USE.  THERE'S A CASE THEY CITED FROM THE ELEVENTH

2    CIRCUIT ABOUT A STUDENT WHO IN A SPEECH MADE FUN OF A

3    DISABILITY THAT ONE OF HIS TEACHERS HAD.

4          THIS CASE IS, THERE'S NOT ANY EVIDENCE OF ANYTHING

5    LIKE THAT IN THIS CASE, YOUR HONOR.  THIS IS PURE EXPRESSION.

6    CERTAINLY IT WAS OFTENTIMES DISPUTATIOUS -- I HAVE TROUBLE WITH

7    THAT WORD SOMETIMES -- DISPUTATIOUS EXPRESSION, BUT IT WAS

8    EXPRESSION NONETHELESS.  AND TO THE EXTENT THAT THAT CAUSED

9    SOME CONFLICT BETWEEN HIM AND HIS FACULTY ADVISORS AND EVEN THE

10   OTHER STUDENTS, THAT DOES NOT BRING IT OUTSIDE THE FIRST

11   AMENDMENT.  THIS IS PRECISELY WHEN WE NEED THE FIRST AMENDMENT

12   TO PROTECT UNPOPULAR AND MINORITY VIEWPOINTS.  THAT'S THE

13   FABRIC OF OUR SOCIETY, YOUR HONOR.

14        I THANK YOU VERY MUCH FOR YOUR TIME TODAY.

15        THE COURT:  LET ME ASK YOU THIS.

16        MR. RADFORD:  YES, SIR.

17        THE COURT:  THE ELEMENT OF A TEMPORARY RESTRAINING

18   ORDER THAT MOST CONCERNS ME IN THE PRESENT POSTURE OF THE CASE,

19   LOOKING AT THE RECORD THAT'S BEFORE THE COURT NOW, IS THE

20   SUBSTANTIAL LIKELIHOOD OF SUCCESS.  AND THAT'S BECAUSE OF THE

21   EVIDENCE THAT'S OFFERED BY THE DEFENSE OF OTHER LEGITIMATE

22   REASONS FOR THEIR ACTIONS IN TERMS OF FAILURE TO ATTEND -- AND

23   I'LL TELL YOU NOW, I MEAN, THINGS LIKE NOT ATTENDING THE

24   HOMECOMING DANCE BECAUSE YOU'RE REPRESENTING THE SCHOOL AT A

25   DEBATE TOURNAMENT AT WAKE FOREST DOES NOT, THAT DOESN'T, I

1   MEAN, I HAVE SOME PROBLEMS WITH THAT.  THE SPEECH MADE TO THE

2   INCOMING FRESHMAN, THOSE ARE THROWAWAYS TO ME.  THAT IS

3   PRETEXTUAL ALMOST ON ITS FACE, TO ME.

4          BUT THE OTHERS.  THERE ARE MANY OTHERS THAT ARE NOT.

5   THE IDEA THAT HE WOULD NOT CONFORM TO THE DIRECTIONS OF THE

6   ADVISORS, FOR EXAMPLE, REGARDING MEETING TIME.  THERE'S SOME

7   PRETTY, WHAT APPEARS TO BE SOME PRETTY CLEAR INDICATIONS THAT

8   HE DIDN'T FOLLOW WHAT SHOULD BE AN APPROPRIATE PROCEDURE, THAT

9   MAYBE HE DIDN'T DO SOME OTHER THINGS HE SHOULD HAVE DONE THAT I

10  THINK THE ADVISORS HAVE EVERY RIGHT TO EXPECT HE WOULD DO, THE

11  RESPECT THAT THEY'RE ENTITLED TO BECAUSE THEY TAKE ON THE

12  RESPONSIBILITY OF BEING ADVISORS AND THE WAY IN WHICH HE SHOULD

13  DEAL WITH THEM.  THAT'S PART OF WHAT SCHOOL IS ABOUT.  I MEAN,

14  TEACHERS ARE ENTITLED TO BE TREATED APPROPRIATELY AND

15  RESPECTFULLY.

16         BUT THOSE MATTERS GIVE ME PAUSE BECAUSE IF THE COURT

17  ULTIMATELY FINDS THAT THOSE ARE TRUE, AND THERE'S NOTHING TO

18  SUGGEST AT THIS POINT THAT SOME OF THOSE ARE NOT, THE FACT THAT

19  YOU COULD ULTIMATELY PREVAIL ON THIS SPEECH HAVING BEEN THE

20  PROBLEM.

21         NOW, I CAN FORESEE YOUR ARGUMENT, YOU'VE ALREADY MADE

22  IT, THE TIMING IS SUGGESTIVE THAT THE SPEECH HAD A GREATER

23  INFLUENCE THAN THESE OTHER MATTERS; THE FACT THAT THERE HAD NOT

24  BEEN A WARNING SHOT FIRED THAT THESE THINGS CAN CAUSE YOU TO

25  LOSE YOUR POSITION.  BUT THERE HAD AT LEAST BEEN, IT APPEARS TO

1    ME FROM WHAT'S BEEN SUBMITTED THERE HAD BEEN COMMUNICATIONS

2    WITH YOUR CLIENT THAT THERE WERE SOME ISSUES THAT HE NEEDED TO

3    BE ADDRESSING.  IT WAS NOT A COMPLETE SURPRISE TO HIM THAT HIS

4    LEADERSHIP STYLE MAY HAVE BEEN CAUSING SOME DIFFICULTIES.  I

5    THINK HE HAD BEEN ADVISED OF THAT.  SO WHILE THEY MAY NOT HAVE

6    SAID THE ULTIMATE PENALTY MAY BE YOU'LL LOSE YOUR POSITION,

7    THERE HAD CERTAINLY BEEN SUGGESTIONS, IT SEEMS, THAT THEY WERE

8    NOT PLEASED WITH SOME OF THE WAYS HE WAS DOING BUSINESS.

9         WHAT IS THERE TO SUGGEST THAT THERE IS A SUBSTANTIAL

10   LIKELIHOOD THAT YOU PREVAIL IN LIGHT OF THESE FACTUAL ISSUES

11   THAT ARE PRESENT?

12        MR. RADFORD:  YES, YOUR HONOR.  AND IF YOU'LL ALLOW

13   ME TO ADDRESS THAT BRIEFLY.  IF YOU LOOK AT, YOU KNOW, THIS

14   LIST OF REASONS THAT THEY HAVE GIVEN, WHEN YOU START PULLING

15   OUT THE THINGS THAT ARE CLEARLY FIRST AMENDMENT ACTIVITIES, YOU

16   START PULLING OUT THE OFF-CAMPUS COMMUNICATION, YOU START

17   PULLING OUT THE PUSHING FOR POLICY CHANGES, YOU START PULLING

18   OUT THE ABSURD THINGS LIKE THIS VERY POSITIVE SPEECH HE GAVE TO

19   THE FRESHMAN CLASS, HIS NOT ATTENDING HOMECOMING EVENTS BECAUSE

20   HE WAS AT A DEBATE TOURNAMENT, IT'S LIKE A, I DON'T KNOW IF YOU

21   KNOW THE GAME JENGA, THE MORE PIECES YOU PULL OUT OF THE WHOLE,

22   THE WEAKER THE THING GETS AND IT FALLS.

23        AND I WOULD SUGGEST, YOUR HONOR, THESE WERE NOT

24   ISSUES PRESENTED TO HIM INDIVIDUALLY.  THESE WERE PRESENTED,

25   THIS WAS PRESENTED TO HIM AS A WHOLE AND RIGHT AFTER A MOMENT

1  OF INTENSE ADVOCACY ON HIS PART.  AND YOUR HONOR, I BELIEVE THE

2  EVIDENCE FIRMLY ESTABLISHES, ESPECIALLY WITH THE TIMING AND THE

3  SPECIFIC REFERENCE TO THESE ISSUES, THAT THE, QUOTE, UNQUOTE,

4  LEGITIMATE REASONS ARE INEXTRICABLY INTERTWINED WITH THE FIRST

5  AMENDMENT REASONS.

6       AND YOU KNOW, ALBEIT, YOU KNOW, DIDN'T ATTEND THE

7  HOMECOMING FESTIVITIES, THAT HAPPENED IN SEPTEMBER.  SOME OF

8  THESE ISSUES ABOUT HIM NOT INCLUDING SOMEONE ON AN E-MAIL,

9  THESE HAPPENED MONTHS PRIOR.  AND, YOU KNOW, THOSE ARE THINGS

10 YOU CAN WORK OUT WITH A STUDENT.  AS TEACHERS, THE JOB IS TO,

11 YOU KNOW, IF A STUDENT IS GOING IN THE WRONG DIRECTION ON

12 SOMETHING ORGANIZATIONAL LIKE THAT, I'M REMINDED OF THE

13 HALLMARK FIRST AMENDMENT PRINCIPLE THAT WHEN FIRST AMENDMENT

14 RIGHTS ARE AT STAKE, WHATEVER THE STATE OR THE GOVERNMENT

15 ENTITY DOES MUST BE THE LEAST RESTRICTIVE MEANS TO ACHIEVE A

16 VITAL GOVERNMENT END.

17      AND, YOU KNOW, KICKING SOMEONE OFF AND STRIPPING THEM

18 OF AN HONOR THEY'VE EARNED BECAUSE THEY DON'T INCLUDE SOMEONE

19 ON AN E-MAIL, WITHOUT THESE THINGS THAT ARE MORE INTENSE AND

20 MORE SERIOUS IN THEIR MINDS, WHICH IS HIS PUSHING HIS VIEWS AND

21 HIS ADVOCATING FOR HIS VIEWS, IT JUST SIMPLY DOES NOT MAKE

22 SENSE THAT HE WOULD BE REMOVED FOR THOSE REASONS.

23      SO I WOULD SUBMIT, YOUR HONOR, THAT YOU CANNOT, YOU

24 CANNOT -- EACH OF THESE INDIVIDUAL REASONS DOES NOT STAND ON

25 ITS OWN.  THE ILLEGITIMATE REASONS FOR HIS REMOVAL ARE

1  INEXTRICABLY INTERTWINED WITH THE OVERALL REASONS FOR HIS

2  REMOVAL.  AND THERE'S A DRAMATIC CHILLING EFFECT THAT WILL

3  HAPPEN IF -- YOU KNOW, I MEAN, THEY COULD HAVE GIVEN HIM A LIST

4  OF A HUNDRED REASONS AND, YOU KNOW, IT COULD HAVE INCLUDED

5  EVERY E-MAIL HE DIDN'T INCLUDE SOMEONE ON OR SOMETHING LIKE

6  THAT, AND THEN I WOULD BE IN A MUCH MORE DIFFICULT POSITION.

7          BUT WHEN YOU LOOK AT THE CASE AS A WHOLE, I HAVE A

8  GUT FEELING ABOUT WHAT HAPPENED, AND I KNOW THAT DOESN'T MEAN

9  EVERYTHING, BUT YOU CAN -- THERE'S A GUT FEELING ABOUT WHAT

10  HAPPENED HERE.  YOU SEE IT IN THE TIME LINE.  YOU SEE IT IN THE

11  LANGUAGE THEY USE WHICH IS ANTI-DEMOCRATIC, WHICH IS ANTI-FREE

12  SPEECH, WHICH IS CHILDREN SHOULD BE SEEN AND NOT HEARD.  BUT IN

13  THE UNITED STATES OF AMERICA, STUDENTS ARE TO BE HEARD BECAUSE

14  THAT'S HOW WE GOVERN OUR SOCIETY IS THROUGH SPEECH.  AND THAT'S

15  WHAT HAPPENED HERE, YOUR HONOR.

16          THE COURT:  THANK YOU.

17          MR. RADFORD:  THANK YOU VERY MUCH.

18          THE COURT:  MR. HATCHER?

19          MR. HATCHER:  THANK YOU, YOUR HONOR.

20          YOUR HONOR, LET ME START BY SAYING ONE THING:  I LOVE

21  WHAT I DO, BUT I WOULD MUCH RATHER MAKE A LIVING

22  CROSS-EXAMINING PEOPLE WHO AREN'T 19 YEARS OLD AND IN HIGH

23  SCHOOL.  I TAKE NO PLEASURE IN HAVING TO DO MY JOB WHERE I HAVE

24  TO LAY OUT SOME BLUNT TRUTHS WITH SOMEONE OF THAT AGE, BECAUSE

25  IN MY MIND, I HAVE A CHILD THAT'S NOT MUCH YOUNGER THAN

1    MR. LACK, SO IT'S WITH SOME BIT OF TREPIDATION THAT I WEIGH

2    INTO THAT.

3           I'M NOT, THEREFORE, GOING TO GO THROUGH AND I DON'T

4    THINK THE COURT WANTS TO HEAR BIT BY BIT WHAT WE HAVE LAID OUT.

5    THAT WAS ONE OF THE REASONS WE WANTED TO DO IT IN THE

6    DECLARATIONS SO THAT IT'S THERE.  THE COURT CAN CERTAINLY

7    DECIDE WHAT IT WANTS TO BELIEVE OR NOT.

8           I WOULD SUBMIT TO YOU THAT THIS IS NOT ABOUT THIS

9    ISSUE OF THE PROM COURT.  THERE'S A MARKEDLY DIFFERENT

10   VIEWPOINT OF WHAT TOOK PLACE DEPENDING ON THE DECLARATIONS WE

11   FILED VERSUS WHAT MR. LACK TESTIFIED TO TODAY.  LUCKILY, I

12   DON'T HAVE THE JOB OF SORTING THAT OUT, BUT THE COURT HAS TO DO

13   THAT.

14          MY OPPOSING COUNSEL MADE A VERY GOOD POINT AND IT

15   TIES INTO THE TIMING ISSUE.  I WOULD SUBMIT TO YOU THAT THE

16   TIMING OF THIS HAD ABSOLUTELY NOTHING TO DO TO PROVE THAT THAT

17   SPEECH HAD ANYTHING TO DO WITH WHY HE WAS REMOVED.  AND I WOULD

18   IMPLORE YOU TO LOOK AT THE DECLARATIONS AND THE PATTERNS OF

19   WHAT WE SAW AS PROBLEMS, PATTERNS THAT WERE MADE AWARE TO HIM

20   OVER AND OVER AGAIN.

21          AND MY OPPOSING COUNSEL SAID A LOT OF THESE THINGS

22   HAPPENED MONTHS AGO, THINGS THAT YOU CAN WORK WITH A STUDENT

23   ON.  EXACTLY, EXACTLY.  THAT'S WHAT WE WERE TRYING TO DO.  WHAT

24   IF WE HAD REMOVED HIM AFTER THE FIRST INCIDENT THAT WE THOUGHT

25   WAS SERIOUS ENOUGH?  WHAT HAS MR. LACK LEARNED IN THIS PROCESS

1  OF PARTICIPATING IN A DEMOCRATIC FORM OF GOVERNMENT?  WHAT DOES

2  THAT TEACH HIM WHEN WE TRY TO TEACH OVER SEVERAL MONTHS?

3         AND I WOULD SUBMIT TO YOU THAT THE LAST STRAW WASN'T

4  THIS SPEECH THAT HE RAISED THAT HAD ANYTHING TO DO WITH PROM

5  COURT.  THE LAST STRAW, IF I'M LOOKING AT IT, IS THIS BUSINESS

6  OF THE FEBRUARY 2 E-MAIL EXCHANGE BETWEEN MS. REISER AND

7  MR. LACK ABOUT THE CONVERSATION THEY HAD THE DAY BEFORE AND,

8  HEY, SAW YOU IN THE LUNCHROOM, WE'VE GOT A COUNCIL MEETING

9  TOMORROW OR A PRESIDENT'S COUNCIL MEETING -- I FORGET WHICH, I

10 THINK IT WAS A PRESIDENT'S COUNCIL MEETING -- DON'T FORGET TO

11 SEND THE REMINDER OUT.  HE LOOKS PUZZLED.  AT LEAST ACCORDING

12 TO MS. REISER, HE DIDN'T SEEM TO REMEMBER WHAT IT WAS.  HE

13 SMILES, WALKS OFF.  IT DOESN'T GET SENT.  NOT ONLY DOES IT NOT

14 GET SENT, MR. LACK DOESN'T ATTEND THE MEETING.

15        I WOULD SUBMIT TO YOU THAT WAS THE LAST STRAW.  AND

16 AT THAT POINT I THINK THEY HAD REACHED, AND I THINK THEY SAY

17 THIS IN THEIR DECLARATION, THEY HAD REACHED THE POINT WHERE

18 THEY REALIZED NOTHING IS CHANGING.  WE HAVE A PATTERN OF THE

19 MEETINGS BEING RESCHEDULED OR CANCELLED.  THERE ARE MANY, MANY,

20 MANY THINGS WE CAN POINT TO.

21        I WOULD ALSO DIRECT THE COURT'S ATTENTION TO THE FACT

22 THAT MR. LACK WROTE THE BYLAWS, AND THE BYLAWS EXPRESSLY ALLOW

23 A MODERATOR SUCH AS MS. WERRE AND MS. REISER TO REMOVE HIM AS

24 PRESIDENT IF THEY THINK THAT THERE'S A SERIOUS ENOUGH OFFENSE.

25 THERE DOESN'T HAVE TO BE A VOTE, ANY OF THAT.  THOSE ARE HIS

1    BYLAWS.

2           NOW, I'M GOING TO JUMP AROUND JUST A BIT, YOUR HONOR,

3    BECAUSE I WAS TAKING NOTES AND I WANT TO MAKE SURE I HIT A

4    COUPLE OF POINTS.

5           YOU DON'T LEAVE YOUR FIRST AMENDMENT RIGHTS AT THE

6    SCHOOLHOUSE GATE.  THAT'S TRUE.  BUT I WOULD SUBMIT TO YOU THAT

7    THE CASES WE CITE IN OUR BRIEF THAT DEAL WITH THE EXERCISE OF

8    WHAT IS PROTECTED WITHIN THE CONFINES OF A SCHOOLHOUSE SHOWS

9    YOU DON'T HAVE THE SAME FREE SPEECH PROTECTED SPEECH RIGHTS AS

10   A STUDENT IN A HIGH SCHOOL AS YOU DO AS AN ADULT OUTSIDE OF A

11   PUBLIC -- OR OUTSIDE OF A PUBLIC HIGH SCHOOL.  THERE IS

12   ALLOWANCE FOR RESTRICTION ON SPEECH WHERE THE DISRUPTION OF THE

13   SCHOOL IS AT ISSUE IF THERE IS AN ISSUE OF TRYING TO TEACH

14   CIVILITY AND SOCIAL NORMS.  THERE IS ALLOWANCE FOR THAT, AND

15   THE CASES WE CITE SHOW THAT.

16          MEDIA ATTENTION.  THE MEDIA WAS INVOLVED NOT BY THE

17   SCHOOL.  THE MEDIA WAS INVOLVED THE MOMENT THAT THIS CASE WAS

18   FILED.  MR. RADFORD PUT UP ON HIS WEBSITE THAT HE FILED IT.

19   ALL OF A SUDDEN WE'RE FIELDING CALLS FROM MEDIA, INTERVIEW

20   REQUESTS, STUDENTS BEING APPROACHED.  AND I UNDERSTAND THAT A

21   COUPLE OF THEM HAVE ACTUALLY GOTTEN ATTORNEYS BECAUSE THEY WERE

22   CONCERNED ENOUGH ABOUT PROTECTING THEMSELVES.

23          THE FACT THAT THE MEDIA HAS BEEN BROUGHT TO BEAR UPON

24   THE SCHOOL AND ITS WORKING ENVIRONMENT WEIGHS EXTREMELY HEAVILY

25   AGAINST GRANTING A T.R.O. RESTORING MR. LACK TO HIS PRESIDENCY

1 OF THE STUDENT COUNCIL.  I CANNOT FATHOM HOW MUCH DISRUPTION

2 THAT WOULD CAUSE IF THAT WERE TO HAPPEN FROM A STANDPOINT OF

3 MEDIA, FROM A STANDPOINT OF UNDERMINING OF THE TEACHERS' AND

4 ADMINISTRATORS' AUTHORITY TO DECIDE HOW THE SCHOOL WAS GOING TO

5 WORK AND TO TAKE CORRECTIVE ACTION.  AND A LOT OF CASES THAT WE

6 CITE DEAL WITH SITUATIONS WHERE THE COURT HAS SAID IT'S OKAY TO

7 RESTRICT FREE SPEECH BECAUSE YOU NEED TO MANAGE THE WAY THE

8 SCHOOL IS WORKING AND THERE'S A GREATER GOOD HERE FOR THE

9 POPULATION OF THE SCHOOL THAT'S AT ISSUE.

10   I DON'T THINK THIS IS A CASE OF, QUOTE, PURE

11 EXPRESSION, CLOSE QUOTE.  FROM OUR STANDPOINT, YOUR HONOR, WE

12 DON'T THINK THAT THE FIRST AMENDMENT IS IMPLICATED IN THIS CASE

13 AT ALL.  IT WAS NOT GIVEN AS A BASIS, IT WAS NOT A BASIS FOR

14 HIS REMOVAL FROM THE PRESIDENCY OF THE STUDENT COUNCIL.  THE

15 FACT THAT IT TOUCHES ON SOME OF THESE ISSUES I DON'T THINK

16 TRIGGERS ENOUGH THAT THAT WAS THE REASON HE WAS RELEASED.

17 WE'VE SET FORTH IN OUR DECLARATIONS AND OUR BRIEF, ACTUALLY

18 DECLARATIONS, ALL THE REASONS, THE LEGITIMATE REASONS WHY HE IS

19 NOT BEING PRESIDENT ANY MORE.

20   THE HOMECOMING ISSUE.  LET'S BE CLEAR ABOUT

21 SOMETHING:  NOBODY HAS A PROBLEM WITH HIM GOING TO A DEBATE

22 TOURNAMENT AT WAKE FOREST.  THOSE AREN'T THE ISSUES.  AND QUITE

23 FRANKLY, I THINK IF THIS WAS THE ONLY THING THAT HAPPENED WAS

24 THE HOMECOMING WEEK, IT'S NOT THAT BIG A DEAL.  BUT THE POINT

25 IS THAT HE'S THE FACE OF THE STUDENT COUNCIL, AND ONE OF THEIR

1 EXPRESSED PURPOSES IN THE BYLAWS IS TO BE ENGAGED IN SCHOOL

2 SPIRIT AND HOMECOMING, THOSE TYPES OF THINGS. HE'S THE FACE OF

3 THE STUDENT COUNCIL. HE AGREED TO DO CERTAIN THINGS DURING

4 THAT WEEK EXPRESSLY BECAUSE HE WASN'T GOING TO BE THERE FOR THE

5 BIG EVENTS ON THE WEEKEND. EVERYBODY KNEW THAT. BUT IT'S THE

6 THINGS THAT HE AGREED TO DO DURING THE WEEK BEFORE HE LEFT THAT

7 HE DIDN'T DO. THAT'S A PROBLEM. IT WASN'T ANYTHING THAT HE

8 NEEDED TO BE REMOVED FOR AT THE TIME. BUT THEY DID MEET WITH

9 HIM AND THEY TALKED TO HIM ABOUT IT.

10      AS FAR AS THE ISSUE OF THE NO WARNING SHOT, I'M

11 SORRY, I JUST HAVE TO RESPECTFULLY DISAGREE WITH MY OPPOSING

12 COUNSEL ON THAT. I THINK THE EVIDENCE IS ABUNDANT THAT THIS

13 WASN'T A SURPRISE. I WOULD DIRECT THE COURT TO THE AFFIDAVIT

14 OF TRACEY EICK, OR DECLARATION, I SHOULD SAY, YOUR HONOR.

15 ACCORDING TO MS. EICK, AND THIS IS CONTRARY TO WHAT MR. LACK

16 TESTIFIED TO TODAY, ACCORDING TO HER, THE MORNING OF FEBRUARY

17 THE 8TH BEFORE HE GOES IN TO MEET WITH MS. WERRE AND

18 MS. REISER, HE GOES IN AND MEETS WITH MS. EICK. HE TELLS

19 MS. EICK, I THINK I'M ABOUT TO BE RELIEVED OF MY POSITION; WILL

20 YOU WEIGH IN WITH MS. KERSEY ON MY BEHALF?

21      THE COURT HAS TO RESOLVE THAT CONFLICT. THAT'S WHAT

22 THE TEACHER IS SAYING HAPPENED.

23      THE OTHER SIGNIFICANT FACT, AND I THINK THIS BEARS

24 UPON ASSISTING WITH RESOLVING WHAT WERE THE REASONS THAT HE WAS

25 RELEASED FROM HIS POSITION, THE AFFIDAVIT OF JOYCE BODEEP, HER

1    NICKNAME, I GUESS, IS NAN IS WHAT SHE GOES BY.  6:09 P.M. THE

2    EVENING OF FEBRUARY THE 8TH WHEN HE'S RELEASED, HE WRITES AN

3    E-MAIL TO HER AND EXPRESSES THE REASONS WHY HE WAS RELEASED.

4    THERE'S NOTHING IN THAT E-MAIL THAT EVEN COMES CLOSE TO

5    IMPLICATING ANY FIRST AMENDMENT ISSUE.  THERE'S NOTHING IN

6    THERE THAT SAYS ANYTHING ABOUT THE PROM COURT ISSUE.  THERE'S

7    NOTHING INDICATING THAT MS. WERRE OR MS. REISER DID ANYTHING

8    IMPROPER TO KEEP HIM FROM EXERCISING ANY FREE SPEECH.  THERE'S

9    NOTHING CLOSE TO THAT:  I WAS RELEASED FOR BREAKING SOME RULE

10   THEY TOLD ME ABOUT THAT I DON'T KNOW ANYTHING ABOUT.  THAT WAS

11   BEFORE ANY OF US LAWYERS GOT INVOLVED.

12           I THINK THAT WHEN THE COURT IS LOOKING AT WHETHER OR

13   NOT THE PLAINTIFF COULD MAKE OUT A RETALIATION CLAIM, I THINK

14   THAT THEY HAVE -- THE PLAINTIFF HAS A MAJOR STUMBLING BLOCK ON

15   THE ISSUE OF CAUSATION; AND THAT'S FOR THE REASON WE'VE LAID

16   OUT IN THE DECLARATIONS.

17           YOUR HONOR, I THINK AT THE END OF THE DAY, LIKE I

18   SAID IN OUR OPENING, THIS IS NOT A SITUATION WHERE MR. LACK WAS

19   REMOVED FOR WHAT HE SAID.  IT WAS WHAT HE DIDN'T DO OR THINGS

20   THAT HE DID THAT MAYBE WEREN'T AS PROPER AS THEY SHOULD HAVE

21   BEEN, WHETHER THAT WAS FOR SCHEDULING MEETINGS OR CANCELLING

22   MEETINGS, WHATEVER.  IN THE ISOLATION, IF YOU PICK THESE ISSUES

23   OFF OF THIS LIST, IN ISOLATION IS ANY ONE OF THEM THAT BAD?  I

24   DON'T KNOW.  CUMULATIVELY IT BUILDS, IT BUILDS, IT STARTS IN

25   SEPTEMBER, IT BUILDS IN OCTOBER, IT BUILDS IN NOVEMBER, IT

1    BUILDS IN DECEMBER, IT BUILDS IN JANUARY; AND THEN FEBRUARY 2

2    WE FINALLY HAVE, GOSH, I DON'T SEE ANYTHING CHANGING.  SIMPLE

3    REQUEST, PLEASE SEND A REMINDER FOR THE MEETING.  DON'T SEND A

4    REMINDER, DON'T SHOW UP.  HOW MUCH LONGER?

5            YOUR HONOR, WE DON'T THINK THIS IS A CASE THAT'S

6    APPROPRIATE FOR THE T.R.O. TO BE GRANTED.  WE'RE ASKING THAT

7    YOU DENY IT AS WELL AS ANY OTHER INJUNCTIVE RELIEF IF AND WHEN

8    THE COURT IS RIPE TO HEAR THAT.

9            THE COURT:  THANK YOU.

10           MR. HATCHER:  THANK YOU, YOUR HONOR.

11           MR. RADFORD:  COULD I SPEAK BRIEFLY, YOUR HONOR?

12           THE COURT:  YES, SIR.

13           MR. RADFORD:  JUST VERY BRIEFLY, YOUR HONOR, FIRST OF

14   ALL, I WANT TO REMIND THE COURT OF THE FAIRLY LIMITED NATURE OF

15   THE TEMPORARY RESTRAINING ORDER WE'RE ASKING FOR.  WE WOULD

16   CERTAINLY CONSENT TO AN EXPEDITED DISCOVERY SCHEDULE PRIOR TO

17   THE PRELIMINARY HEARING SO THAT IF IN THE UNLIKELY EVENT THE

18   DEFENDANTS WERE TO PREVAIL, HE COULD BE, I GUESS, RE-REMOVED

19   BEFORE THE SCHOOL YEAR IS OVER.  THE TEMPORARY RESTRAINING

20   ORDER DOESN'T FINALLY SETTLE THE DISPUTE.  IT JUST ALLOWS HIM

21   TO, YOU KNOW, PERFORM THESE LAST DAYS AND WEEKS THAT HE HAS AND

22   THE HONOR THAT HE EARNED THROUGH HIS OWN EFFORT AND THAT HE WAS

23   DEMOCRATICALLY ELECTED TO HOLD.  IT'S NOT A PERMANENT THING.

24           I WANT TO POINT TO A VERY IMPORTANT STATEMENT THAT MY

25   BROTHER MADE IN HIS ARGUMENT.  HE NOTED THE CUMULATIVE NATURE

1  OF THE COMPLAINTS.  HE POINTED TO THAT LIST AND SAID,

2  INDIVIDUALLY, EACH OF THESE AREN'T THAT BAD, IT'S THE FACT THAT

3  THEY'RE ALL TOGETHER, WHICH IS EXACTLY THE POINT THAT I MADE,

4  YOUR HONOR, IS THAT IF YOU TAKE OUT, YOU START TAKING THINGS

5  OUT OF THAT LIST, INDIVIDUALLY THOSE REASONS AREN'T ENOUGH.

6  AND THERE ARE EXPLICIT REFERENCES IN THAT LIST TO OFF-CAMPUS

7  COMMUNICATION, THINGS THAT ARE CLEARLY PRETEXTUAL, AND THINGS

8  THAT CLEARLY IMPLICATE HIS RIGHT TO EXPRESS HIMSELF AND TO

9  SPEAK ON ISSUES OF CONCERN.  GIVEN THAT, YOUR HONOR, THERE IS A

10 SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

11         I ADDRESSED HIS ISSUE ABOUT THE MEDIA.  LIKE I SAY,

12 YOUR HONOR, THE FACT THAT, I MEAN, THE MEDIA COULD ALWAYS --

13 THAT COULD BE USED AS A REASON FOR ANY CASE THAT IS IMPORTANT

14 TO THE PUBLIC AND OF A CONSTITUTIONAL NATURE, THE FACT THAT

15 MEDIA IS INTERESTED AND INVOLVED COULD ALWAYS BE USED TO SAY,

16 YOU KNOW, THAT WILL POSE A RISK OF DISRUPTION.  I DON'T BELIEVE

17 THERE'S ANY EVIDENCE OF FIGHTS, ANY EVIDENCE THAT, YOU KNOW,

18 CLASS HAS NOT BEEN ABLE TO BE CARRIED OUT AS NORMAL.

19         AND SO, YOUR HONOR, I WOULD CONTEND THAT THE EQUITIES

20 WEIGHT HEAVILY IN THE PLAINTIFF'S FAVOR IN THIS CASE.

21         THANK YOU, YOUR HONOR.

22         THE COURT:  I AM GOING TO TAKE THE MATTER UNDER

23 ADVISEMENT BECAUSE I WANT TO HAVE ADEQUATE TIME TO THOROUGHLY

24 STUDY THE AFFIDAVITS THAT HAVE BEEN SUBMITTED ON BEHALF OF THE

25 DEFENSE AND AS WELL AS ON BEHALF OF THE PLAINTIFF AND THE

1    PLAINTIFF'S TESTIMONY TODAY.

2         I JOIN WITH ONE OF THE SENTIMENTS MENTIONED BY

3    MR. HATCHER IN TERMS OF I WOULD JUST AS SOON NOT BE IN THE

4    MIDDLE OF A SCHOOL CONFLICT, AS WELL.  AND SO WHILE I AM NOT

5    YET CERTAIN WHAT I WILL DO BECAUSE I HAVEN'T, I FEEL, FULLY

6    EMERSED MYSELF IN THE EVIDENCE IN THE CASE SUFFICIENT TO MAKE A

7    RULING, I WANT TO MAKE A COUPLE OF COMMENTS TO BOTH SIDES

8    BEFORE WE LEAVE.  AND THIS IS TOTALLY OUTSIDE OF MY

9    JURISDICTION WHAT I'M ABOUT TO SAY.  I JUST WANT TO SHARE IT

10   WITH YOU BECAUSE I'VE GOT AN INTEREST IN THIS AS A HUMAN BEING.

11        MR. LACK, LET ME SAY TO YOU THAT WE NEED MORE

12   STUDENTS LIKE YOU WHO ARE WILLING TO THINK INDIVIDUALLY.  AND

13   IT IS, QUITE HONESTLY, YOUNG MEN LIKE YOU WHO CAUSE CHANGE TO

14   OCCUR.  SOMETIMES WE HAVE THAT CHANGE AND IT HURTS AND IS

15   UNCOMFORTABLE AND IS NOT FUN, BUT IT IS BECAUSE PEOPLE ARE

16   WILLING TO THINK AND BE CREATIVE THAT THOSE THINGS HAPPEN.

17   NOW, IT'S NOT FUN ON THIS SIDE OF THE ROOM, BUT IT'S REALLY NOT

18   THAT MUCH FUN ON YOUR SIDE EITHER BECAUSE YOU FELT SOME HURT

19   THROUGH THIS PROCESS, AS WELL.

20        OUR CONSTITUTION GUARANTEES CERTAIN RIGHTS TO

21   EVERYONE, AND FOR ME ONE OF THE MOST SACRED IS THE FIRST

22   AMENDMENT.  AND IT IS SACRED BECAUSE IT IS ONE OF THE TOUGHEST

23   BECAUSE THERE'S NOTHING WORSE THAN HAVING TO STAND AND HAVE

24   SOMEONE SAY SOMETHING OR DO SOMETHING THAT TO YOU IS THE MOST

25   OFFENSIVE THING YOU EVER IMAGINED AND TO SAY, WHILE I DESPISE

1  EVERY WORD YOU'RE SAYING, I HONOR YOUR RIGHT TO SAY IT AND WILL

2  DEFEND IT AND PROTECT IT.  AND THAT'S WHAT THE FIRST AMENDMENT

3  IS ABOUT.  AND THAT'S WHY WE, AS A COURT, HAVE TO JEALOUSLY

4  GUARD THAT RIGHT EVEN IF IT MAY CAUSE SOME DISCOMFORT OR

5  PROBLEMS.  AND IT DOESN'T MATTER IF THE MEDIA IS THERE OR NOT.

6  YOU KNOW, QUITE HONESTLY, ONE OF THE BEAUTIES OF MY JOB IS I

7  CAN STEP AWAY FROM THAT.  AS FRIENDS REMIND ME, YOU DON'T HAVE

8  TO RUN FOR ELECTION.  BUT -- AND THAT'S GREAT BECAUSE THAT

9  ALLOWS ME TO DO WHAT IS SUPPOSED TO BE DONE TO PROTECT THE

10 RIGHTS OF CITIZENS.

11        AND SO I COMMEND YOU FOR THAT.  YOU'RE OBVIOUSLY A

12 VERY BRIGHT YOUNG MAN WITH A VERY BRIGHT FUTURE.  AND

13 REGARDLESS OF WHAT HAPPENS HERE TODAY, I'M CONFIDENT THAT YOU

14 WILL ENJOY THAT.  YOU WILL EITHER THINK THE COURT IS ONE OF THE

15 FINEST THINGS THAT'S EVER BEEN DEVELOPED IN OUR SYSTEM OF

16 GOVERNMENT OR YOU'LL THINK IT'S JUST ANOTHER GROUP OF OLD FOLKS

17 THAT DON'T KNOW WHAT THE HECK IS GOING ON IN THE WORLD.  AND I

18 KNOW I CONTROL HOW YOU WILL FEEL ABOUT THAT, BUT I WANTED TO

19 SAY THIS TO YOU BEFORE I RULE SO THAT WHICHEVER OUTCOME OCCURS,

20 ONCE AGAIN, THE BEAUTY OF OUR NATION IS YOU'RE FREE TO HAVE

21 EITHER OF THOSE THOUGHTS.  BUT LET ME SAY TO YOU REGARDLESS OF

22 WHAT I DO, I DO UNDERSTAND WHAT THIS IS ABOUT AND I THINK I

23 UNDERSTAND YOU.

24        TO THE FOLKS ON THE OTHER SIDE OF THE ROOM, LET ME

25 SAY I WOULD NEVER TAKE YOUR JOB.  IT'S A GOOD THING THIS ONE IS

1    FOR LIFE; BUT EVEN IF IT WERE NOT, I WOULDN'T TAKE YOUR JOB, I

2    WOULDN'T HAVE IT.  WHAT YOU DO IS OFTEN THANKLESS WORK.  IT'S

3    DIFFICULT WORK.  YOUNG MEN LIKE MR. LACK CAN BE THE JOY OF YOUR

4    EXISTENCE OR THE BANE OF YOUR EXISTENCE, AND I UNDERSTAND THAT

5    BECAUSE THAT CREATIVITY, THAT BRIGHTNESS, THAT INTELLECT

6    EXCITES YOU, UT IT CHALLENGES YOU; AND IT IS, IT CAN BE VERY

7    DIFFICULT AND I UNDERSTAND THAT.

8         AND YOU MUST UNDERSTAND, AND I KNOW IT'S HARD BECAUSE

9    YOU'RE IN AN ENVIRONMENT WHERE LANGUAGE CAN INCITE

10   DIFFICULTIES.  IT CAN MAKE YOUR JOB SO MUCH HARDER TO DO; YOU

11   KNOW, THE SMART-ALECK KID WHO SITS OUT THERE AND ALWAYS HAS THE

12   REAL BRIGHT COMMENT TO MAKE THAT JUST INCITES OTHERS TO

13   DISRUPTION AND PROBLEMS.  I CAN'T IMAGINE YOUR DAY.  I'VE GOT

14   THE BEAUTY OF A WONDERFUL COURTROOM AND MARSHALS WHO SIT AROUND

15   AND WILL SMACK YOU IF YOU MISBEHAVE, AND I DON'T HAVE TO WORRY

16   ABOUT DOING IT.  THAT'S A GREAT LIFE, IT'S A GREAT LIFE, IT

17   REALLY IS.  AND HOW YOU DO WHAT YOU DO I DON'T KNOW.

18        AND THE FOLKS THAT STEP UP AND TAKE ON THINGS LIKE

19   STUDENT COUNCIL, AND I DON'T KNOW WHO YOU FOLKS ARE SO I DON'T

20   KNOW WHO THE TWO ADVISORS ARE, BUT THE FOLKS WHO TAKE THAT ON

21   ARE TAKING ON RESPONSIBILITIES YOU DON'T HAVE TO DO.  AND WHAT

22   THAT SAYS TO ME IS YOU REALLY CARE ABOUT KIDS AND YOU WANT THEM

23   TO HAVE A GOOD, POSITIVE EXPERIENCE.  MY GUESS IS YOU DON'T GET

24   PAID ANY EXTRA FOR THAT; OR IF YOU DO, IF YOU COUNTED UP THE

25   HOURS YOU SPEND ON IT AND CALCULATED IT OUT, YOU'RE SO FAR

1    BELOW MINIMUM WAGE IT'S NOT EVEN FUNNY.

2         AND MR. HATCHER, DON'T WORRY, I'M NOT SUGGESTING A

3    FAIR LABOR STANDARDS ACT CLAIM.  DON'T GET EXCITED.

4         MR. HATCHER:  THANK YOU, YOUR HONOR.

5         THE COURT:  BUT IT IS, IT'S TOUGH DUTY, AND I KNOW

6    THAT.  AND I KNOW FROM YOUR PERSPECTIVE YOU SIT HERE AND YOU

7    THINK THIS GUY IS OUT OF TOUCH, HE'S GOING DOWN A LIST THAT

8    HE'S SAYING THIS SHOULDN'T MATTER, THIS SHOULDN'T MATTER; HE'S

9    NOT WHERE I AM EVERY DAY, HE DOESN'T KNOW WHAT MY LIFE IS LIKE.

10        I HAVE SOME SENSE OF WHAT YOUR LIFE IS ABOUT.  I DO

11   UNDERSTAND THINGS THAT MATTER AND THINGS THAT CAN DISRUPT YOUR

12   LIFE AND YOUR SCHOOL AND WHAT YOU'RE TRYING TO ACCOMPLISH IN

13   YOUR SCHOOL.  I DO HAVE SOME APPRECIATION FOR THAT.  AND FOR

14   YOU, AS WELL, REGARDLESS OF WHAT I DO HERE, IF I WERE TO RULE

15   FOR THE PLAINTIFF, IT WOULD NOT BE AN INDICTMENT OF YOU AS

16   PERSONS, AS TEACHERS OR AS ADVISORS.  IT WOULD BE THE VERY SAME

17   REASON I WOULD RULE FOR HIM THAT I SUGGESTED A MOMENT AGO, IT

18   WOULD BE BECAUSE I AM SO JEALOUSLY GUARDING THE FIRST AMENDMENT

19   AND THE PROTECTIONS OF IT.

20        I WILL SAY TO YOU SOME OF THE REASONS YOU'VE CITED ON

21   YOUR LIST TOUCH ON FIRST AMENDMENT KINDS OF ISSUES IN TERMS OF

22   EXPRESSIONS OF VIEWS AND SO FORTH.  THE DIFFICULTY FOR MR. LACK

23   IS THAT SOME OF THOSE ALSO GO TO RESPONSIBILITY AND THE THINGS

24   THAT ARE THE ROLE OF A STUDENT BODY PRESIDENT.  AND SO THIS IS

25   A MIXED BAG.  I CAN'T DO A CHART AND SAY THIS IS THIS, THIS IS

1    THIS, THIS IS THIS; GRADE IT, ASSIGN A SCORE AND DECIDE THIS IS

2    THE OUTCOME.

3            THIS, MR. LACK, IS NOT SCIENCE; IT IS ART.  WE CANNOT

4    MERELY DO A CACULUS AND COME OUT WITH A RESOLUTION.  IT'S A

5    WEIGHING AND A BALANCING THAT MUST TAKE PLACE.  ON THE ONE

6    HAND, IT'S A FIRST AMENDMENT; AND ON THE OTHER HAND, THERE ARE

7    OTHER ISSUES.  BUT THE FIRST ISSUE IS IS IT EVEN THE FIRST

8    AMENDMENT.  AND AS I SAID WHEN WE STARTED OUT TO BOTH LAWYERS,

9    WHAT THIS CASE IS REALLY ABOUT, AND I'LL TELL YOU RIGHT NOW I

10   HAVE NOT CHANGED MY MIND, IS WERE YOU REMOVED FROM YOUR

11   POSITION BECAUSE YOU TOOK A POSITION ON THE GAY- AND

12   LESBIAN-RIGHTS ISSUES OR WERE YOU REMOVED FOR OTHER REASONS.

13   AND QUITE HONESTLY, AND I NEED TO TELL YOU THIS, WHETHER THOSE

14   REASONS ARE REASONS I WOULD HAVE REMOVED YOU OR NOT IS NOT FOR

15   ME TO DECIDE BECAUSE I'M NOT YOUR STUDENT GOVERNMENT ADVISOR.

16   IT IS, RATHER, WHETHER THEY RELIED ON THOSE REASONS.  AND SO

17   THAT'S WHY I SAID TO YOUR LAWYER THAT'S ONE OF THE ISSUES

18   YOU'VE GOT IN TERMS OF THE SUBSTANTIAL LIKELIHOOD OF SUCCESS

19   BECAUSE THAT'S THE WAY I HAVE TO LOOK AT THAT.

20           I ADMIRE BOTH SIDES OF THIS ROOM GREATLY.  THAT'S

21   WHAT I'M TRYING TO SAY TO YOU.  I THANK YOU FOR WHAT YOU DID AS

22   STUDENT GOVERNMENT PRESIDENT, FOR WHAT I KNOW YOU'RE GOING TO

23   DO AS YOU CONTINUE YOUR CAREER.  BASED ON WHERE YOU'RE MAKING

24   STUDENT VISITS, YOU'VE GOT A PRETTY BRIGHT FUTURE AHEAD OF YOU.

25           I THANK YOU FOR WHAT YOU DO, FOR THE THANKLESS JOB

1   YOU DO EVERY DAY FOR HAVING TO DEAL WITH PARENTS AND

2   ADMINISTRATORS -- SORRY TO THE PRINCIPAL IF SHE'S SITTING OVER

3   THERE, OKAY -- WITH THE ADMINISTRATORS. BUT BY THAT I REALLY

4   MEAN THE COUNTY OFFICE, NOT THE PRINCIPAL. BUT FOR THE THINGS

5   YOU HAVE TO DEAL WITH, I'M SORRY FOR THAT. BUT I APPRECIATE

6   WHAT YOU DO. IT IS TOUGH WORK; AND THANK YOU, THANK YOU FOR

7   DOING THAT FOR ALL OFF US.

8        AND THERE'S ONE LAST GROUP AND THAT'S THE STUDENTS OF

9   THE HIGH SCHOOL. SOME MENTION HAS BEEN MADE ABOUT CONCERNS

10   ABOUT DISRUPTION AND SO FORTH. WHEN THIS CASE FIRST CAME TO

11   ME, I WAS REAL INTERESTED BECAUSE I PERCEIVED IT AS A DIFFERENT

12   MATTER THAN IT WAS. BUT I WANT TO SAY WHEN I READ ABOUT HOW

13   THE MEETING DID PROCEED AND HOW THE DISCUSSION ENSUED IN THE

14   FIRST MEETING, I WAS REALLY IMPRESSED BY THE STUDENTS AT THIS

15   SCHOOL AND THE PEOPLE ON THE STUDENT COUNCIL. I WAS IMPRESSED

16   BY THEIR INSIGHTS AS TO THE ISSUE, THEIR EFFORTS TO SEEK

17   COMPROMISE. I WISH IT HAD CARRIED ITSELF OUT, IN ALL HONESTLY,

18   AND IT HAD JUST BEEN VOTED ON AT THE FIRST MEETING BECAUSE IT

19   LOOKS LIKE TO ME THE STUDENTS WERE GOING TO EXERCISE THE ROLE

20   TO SPEAK. AND IT DIDN'T HAPPEN, AND WE CAN ALL DEBATE ABOUT

21   WHY THAT OCCURRED AND WE COULD PROBABLY ASSIGN BLAME ALL AROUND

22   THE ROOM. BUT I DON'T NEED TO GO THERE BECAUSE THAT'S NOT MY

23   POINT.

24        MY POINT IS THAT YOU SHOULD BE PROUD OF YOUR FELLOW

25   STUDENTS. YOU SHOULD BE PROUD OF YOUR STUDENTS AND LEADERSHIP

1 WHO FOSTERED AN ENVIRONMENT WHERE THIS KIND OF THING, NUMBER

2 ONE, EVEN CAME UP; BUT NUMBER TWO, WHERE STUDENTS WERE MATURE

3 ENOUGH TO ENGAGE IN WHAT SEEMED TO ME TO BE A PRETTY MATURE

4 CONVERSATION AND GRAPPLING WITH THE ISSUES.  I FOUND THAT

5 PRETTY IMPRESSIVE.  IT SAID A LOT TO ME ABOUT THE STUDENTS AT

6 YOUR SCHOOL AND IS SOMETHING I THINK YOU SHOULD BE PROUD OF.

7        SO I DON'T KNOW WHAT'S BEING SAID IN THE MEDIA.  I

8 CHOOSE TO TRY TO AVOID THAT BECAUSE I'VE GOT TO TRY TO DECIDE

9 IT BASED ON THE EVIDENCE PRESENTED.  SO I TRY TO AVOID NEWS

10 STORIES ABOUT IT, SO I DON'T KNOW WHAT'S BEING SAID.  BUT WHAT

11 I SAY TO YOU IS THIS LOOKS LIKE A PRETTY GOOD STUDENT BODY IN

12 TERMS OF THE WAY THEY WERE TRYING TO GRAPPLE WITH AND DEAL WITH

13 THIS ISSUE IN TERMS OF THE FOLKS WHO HAD IT BEFORE THEM TO DEAL

14 WITH.  IT LOOKED PRETTY IMPRESSIVE TO ME.

15        OKAY, NOW I'LL STEP DOWN OFF MY SOAPBOX AND TELL YOU

16 THAT I WILL TRY TO RULE AS QUICKLY AS POSSIBLE.  I KNOW, AS I

17 HAVE SAID, I DO HAVE CONCERNS THAT IF YOU'RE ENTITLED TO

18 RELIEF, MR. LACK, A SUBSTANTIAL DELAY IN THAT RELIEF

19 ESSENTIALLY DENIES YOU THE RELIEF.  SO IF YOU'RE ENTITLED TO

20 IT, I WILL GRANT IT QUICKLY.

21        IF YOU'RE NOT IN MY VIEW, I'M GOING TO RULE ON THAT

22 QUICKLY SO THAT YOU FOLKS HAVE SOME PEACE ABOUT IT, AS WELL.

23        I CAN SAY TO YOU ONLY THAT I'M GOING TO LOOK AT IT

24 VERY CLOSELY.  YOU KNOW, SOME PEOPLE WOULD SAY, WHY ARE YOU

25 TAKING YOUR TIME WITH THESE LITTLE SCHOOL ISSUES?  THIS IS NOT

1    JUST A LITTLE SCHOOL ISSUE.  THIS IS IMPORTANT STUFF.  THIS IS

2    THE CONSTITUTION OF THE UNITED STATES, IT'S THE BILL OF RIGHTS,

3    IT'S THE VERY FIRST AMENDMENT.  IT MATTERS, IT MATTERS

4    SIGNIFICANTLY; AND I'M GOING TO TREAT IT THAT WAY.

5            THANK YOU FOR YOUR TIME AND YOUR ASSISTANCE IN

6    HELPING ME GRAPPLE WITH THAT ISSUE.  WE ARE IN RECESS.

7            (PROCEEDINGS CONCLUDED.)

8                              *  *  *

9                    REPORTER'S CERTIFICATION

10   I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM THE
     RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11

12

13                              _____
                                SHARON D. UPCHURCH, RPR
14                              OFFICIAL COURT REPORTER
                                UNITED STATES DISTRICT COURT
15                              NORTHERN DISTRICT OF GEORGIA

16

17   DATE:  APRIL 19, 2012

18

19

20

21

22

23

24

25